# FIDELITY FEDERAL SAVINGS & LOAN ASSOCIATION ET AL. *v.* DE LA CUESTA ET AL.

No. 81–750.   Argued April 28, 1982—Decided June 28, 1982

142

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 171. REHNQUIST, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 172. POWELL, J., took no part in the consideration or decision of the case.

*Ernest Leff* argued the cause for appellants. With him on the briefs was *Andrew E. Katz.*

*Deputy Solicitor General Shapiro* argued the cause for the Federal Home Loan Bank Board et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Lee, Carter G. Phillips, Maud Mater, Gary S. Smuckler,* and *Marilyn Nathanson.*

*Robert E. Boehmer* argued the cause for appellees. With him on the brief was *John D. Meyer.**

---

*Briefs of *amici curiae* urging reversal were filed by *Daniel J. Goldberg* and *Matthew G. Ash* for the American Savings and Loan League; and by *Aaron M. Peck, C. Steven McMurry, Michael R. Grzanka, G. Howden Fraser, Terry O. Kelly,* and *Daniel H. Willick* for the United States League of Savings Associations.

Briefs of *amici curiae* urging affirmance were filed for the State of Michigan et al. by *Frank J. Kelley,* Attorney General of Michigan, *Louis J. Caruso,* Solicitor General, *Harry G. Iwasko, Jr.,* and *Robert Ianni,* Assistant Attorneys General, *John Steven Clark,* Attorney General of Arkansas, and *Frederick K. Campbell,* Assistant Attorney General, *Robert Corbin,* Attorney General of Arizona, and *Anthony B. Ching,* Solicitor General, *J. D. MacFarlane,* Attorney General of Colorado, and *Marshall A. Snider,* Assistant Attorney General, *Carl R. Ajello,* Attorney General of Connecticut, *Tyrone C. Fahner,* Attorney General of Illinois, *Linley E. Pearson,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, and *W. Robert Alderson,* First Deputy Attorney General, *James E. Tierney,* Attorney General of Maine, *Warren R. Spannaus,* Attorney General of Minnesota, *William A. Allain,* Attorney General of Mississippi, *Michael T. Greely,* Attorney General of Montana, *Gregory H. Smith,* Attorney General of New Hampshire, *Jeff Bingaman,* Attorney General of New Mexico, *Rufus L. Edmisten,* Attorney General of North Carolina, *Millard Rich,* Deputy Attorney General, and *John R. B. Matthis,* Special Deputy Attorney General, *Robert O. Wefald,* Attorney General of North Dakota, *William J. Brown,* Attorney General of Ohio, *Dave Frohnmayer,* Attorney General of Oregon, *Daniel R. McLeod,* Attorney General of South Carolina, *John J. Easton, Jr.,* Attorney General of Vermont, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Bronson C. La Follette,* Attorney General of Wisconsin; for the Secretary of the Business, Transportation and Housing Agency of the State of California by *George Deukmejian,* Attorney General of California, *Arthur C. De Goede,* Assistant Attorney General, *Joseph M. O'Heron,* Deputy Attorney General, and *W. Gary Kurtz;* for the California Association of Realtors et al. by *John R.*

JUSTICE BLACKMUN delivered the opinion of the Court.

At issue in this case is the pre-emptive effect of a regulation, issued by the Federal Home Loan Bank Board (Board), permitting federal savings and loan associations to use "due-on-sale" clauses in their mortgage contracts. Appellees dispute both the Board's intent and its statutory authority to displace restrictions imposed by the California Supreme Court on the exercise of these clauses.

I

A

The Board, an independent federal regulatory agency, was formed in 1932 and thereafter was vested with plenary authority to administer the Home Owners' Loan Act of 1933 (HOLA), 48 Stat. 128, as amended, 12 U. S. C. § 1461 *et seq.* (1976 ed. and Supp. IV).[1] Section 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV), empowers the Board,

---

*Hetland* and *Charles A. Hansen;* for the Consumer's Committee to Protect Mortgage Rights by *Irwin M. Alterman;* for the Georgia Assocation of Realtors, Inc., by *E. Catherine Kimmel;* for the National Association of Realtors by *William D. North* and *Robert D. Butters;* and for Charles J. Bether et al. by *Peter J. Gregora, James M. Weinberg,* and *Robert L. Winslow.*

*Bruce O. Jolly, Jr.,* filed a brief for the Credit Union National Association, Inc., as *amicus curiae.*

[1] The Board came into being under § 17 of the earlier Federal Home Loan Bank Act, 47 Stat. 736, as amended, 12 U. S. C. § 1437, the statute which created the federal home loan bank system. The three members of the Board are appointed by the President, with the advice and consent of the Senate, for 4-year terms. See note following 12 U. S. C. § 1437. In addition to providing for the establishment of federal savings and loan associations, the HOLA, by its § 3, 48 Stat. 129, repealed § 4(d) of the Federal Home Loan Bank Act, 47 Stat. 727, which had authorized federal home loan banks to make loans directly to homeowners. The HOLA, by its § 4, 48 Stat. 129, instructed the Board to create the Home Owners' Loan Corporation; this agency was to exchange its bonds for mortgages held by financial institutions, including state-chartered savings and loans, and to provide funds to needy homeowners for accrued taxes, maintenance, and repairs.

"under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations.'" Pursuant to this authorization, the Board has promulgated regulations governing "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *People* v. *Coast Federal Sav. & Loan Assn.*, 98 F. Supp. 311, 316 (SD Cal. 1951).

In 1976, the Board became concerned about the increasing controversy as to the authority of a federal savings and loan association to exercise a "due-on-sale" clause—a contractual provision that permits the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred.[2] Specifi-

---

[2] The due-on-sale clause used in many loan instruments is ¶ 17 of the uniform mortgage instrument developed by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association. Paragraph 17 appears in two of the deeds of trust at issue in this case and reads:

"17. Transfer of the Property; Assumption. If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, *Lender may, at Lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable.* Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Deed of Trust shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17 and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Deed of Trust and the Note.

"If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration in accordance with paragraph 14 hereof. Such

cally, the Board felt that restrictions on a savings and loan's ability to accelerate a loan upon transfer of the security would have a number of adverse effects: (1) that "the financial security and stability of Federal associations would be endangered if . . . the security property is transferred to a person whose ability to repay the loan and properly maintain the property is inadequate"; (2) that "elimination of the due on sale clause will cause a substantial reduction of the cash flow and net income of Federal associations, and that to offset such losses it is likely that the associations will be forced to charge higher interest rates and loan charges on home loans generally"; and (3) that "elimination of the due on sale clause will restrict and impair the ability of Federal associations to sell their home loans in the secondary mortgage market, by making such loans unsalable or causing them to be sold at reduced prices, thereby reducing the flow of new funds for residential loans, which otherwise would be available." 41 Fed. Reg. 6283, 6285 (1976). The Board concluded that "elimination of the due on sale clause will benefit only a limited number of home sellers, but generally will cause economic hardship to the majority of home buyers and potential home buyers." *Ibid.*

Accordingly, the Board issued a regulation in 1976 governing due-on-sale clauses. The regulation, now 12 CFR § 545.8–3(f) (1982),[3] provides in relevant part:

> "[A federal savings and loan] association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instru-

---

notice shall provide a period of not less than 30 days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by paragraph 18 hereof." App. 50–51, 85–86 (emphasis added).

[3] The due-on-sale regulation was codified initially in 12 CFR § 545.6–11(f) (1980). See 44 Fed. Reg. 39108, 39149 (1979).

ment whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. Except as [otherwise] provided in . . . this section . . . , exercise by the association of such option (hereafter called a due-on-sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the association and borrower shall be fixed and governed by that contract."

In the preamble accompanying final publication of the due-on-sale regulation, the Board explained its intent that the due-on-sale practices of federal savings and loans be governed "exclusively by Federal law." 41 Fed. Reg. 18286, 18287 (1976). The Board emphasized that "[f]ederal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements." *Ibid.*[4]

## B

Appellant Fidelity Federal Savings and Loan Association (Fidelity) is a private mutual savings and loan association chartered by the Board pursuant to § 5(a) of the HOLA. Fidelity's principal place of business is in Glendale, Cal. Ap-

---

[4] Even before adopting the due-on-sale regulation, the Board had interpreted 12 CFR § 545.8-3(a) (1982)—a regulation promulgated in 1948 that requires all loan instruments to "provide for full protection to the Federal association"—as authorizing federal savings and loans to exercise due-on-sale provisions, despite any state law to the contrary, because such clauses help ensure "full protection" to the lender. See the Board's Advisory Opinion, Resolution No. 75–647, in *Schott* v. *Mission Federal Sav. & Loan Assn.* (*Schott* Advisory Opinion), No. Civ–75–366, pp. 13–15 (CD Cal. July 30, 1975), reprinted as Exhibit A to Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction.

pellees, de la Cuesta, Moore, and Whitcombe, each made a purchase of California real property from one who had borrowed money from Fidelity. As security for the loan, the borrower had given Fidelity a deed of trust on the property. Each deed of trust contained a due-on-sale clause. Two of the deeds also included a provision, identified as ¶ 15, which stated that the deed "shall be governed by the law of the jurisdiction in which the Property is located." App. 51, 86.[5]

Fidelity was not notified prior to each appellee's purchase of property; when it did learn of the transfer, it gave notice of its intent to enforce the due-on-sale clause. Fidelity expressed a willingness to consent to the transfer, however, if the appellee agreed to increase the interest rate on the loan secured by the property to the then-prevailing market rate. Each appellee refused to accept this condition; Fidelity then exercised its option to accelerate the loan. When the loan was not paid, Fidelity instituted a nonjudicial foreclosure proceeding.

In response, each appellee filed suit in the Superior Court of California for Orange County. Each asserted that, under the principles announced by the California Supreme Court in *Wellenkamp* v. *Bank of America*, 21 Cal. 3d 943, 582 P. 2d

---

[5] Paragraph 15 is also part of the uniform mortgage instrument developed by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association. See n. 2, *supra*. The paragraph reads in full:

"15. Uniform Deed of Trust; Governing Law; Severability. This form of deed of trust combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property. This Deed of Trust shall be governed by the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of the Deed of Trust and the Note are declared to be severable." App. 51–52, 86–87.

970 (1978), Fidelity's exercise of the due-on-sale clause violated California's prohibition of unreasonable restraints on alienation, Cal. Civ. Code Ann. § 711 (West 1982), "unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default." 21 Cal. 3d, at 953, 582 P. 2d, at 977. Each complaint sought (1) a judicial declaration that the due-on-sale clause was not enforceable unless Fidelity first showed that the transfer had harmed its security interest, (2) an injunction against any foreclosure procedures based on the clause, and (3) compensatory and punitive damages. App. 5, 49, 84.[6]

The Superior Court consolidated the three actions and granted appellants' motion for summary judgment. The court explained that "the federal government has totally occupied the subject of regulation of Federal Savings and Loans," and held, therefore, that the decision in *Wellenkamp* "cannot be extended to [federal] savings and loans." App. to Juris. Statement 29a.

The Court of Appeal for the Fourth Appellate District, however, reversed that judgment. In an opinion that adopted substantial portions of a parallel ruling by the Court of Appeal for the First Appellate District, it concluded that the California Supreme Court's opinion in *Wellenkamp* was controlling. 121 Cal. App. 3d 328, 331, 175 Cal. Rptr. 467, 468 (1981), quoting *Panko* v. *Pan American Federal Sav. & Loan Assn.*, 119 Cal. App. 3d 916, 174 Cal. Rptr. 240 (1981), cert. pending, No. 81–922. The court found that Congress had neither expressed an intent to pre-empt state due-on-sale law nor fully occupied the field of federal savings and loan regulation; for example, the court pointed out, federal associations traditionally have been governed by state real prop-

---

[6] Each complaint also included a slander count, alleging that Fidelity had maliciously published false charges that the appellee was in default under the deed of trust. *Id.*, at 9, 54, 89.

erty and mortgage law with respect to title, conveyancing, recording, priority of liens, and foreclosure proceedings.

The Court of Appeal likewise rejected appellants' contention that the Board's 1976 regulation expressly had preempted the *Wellenkamp* doctrine. Although the court recognized that the preamble accompanying 12 CFR § 545.8–3(f) (1982) manifested the Board's intent that its due-on-sale regulation supersede conflicting state law, it refused to "equate the *Board's* expression of intent with the requisite *congressional* intent." 121 Cal. App. 3d, at 339, 175 Cal. Rptr., at 474 (emphasis in original).[7]

Finally, the Court of Appeal found no evidence that federal law impliedly had pre-empted state law, reasoning that California's due-on-sale law was not incompatible with federal law. The *Wellenkamp* doctrine, the court observed, "is a substantive rule of California property and mortgage law," and not a form of "regulation" over federal savings and loans. 121 Cal. App. 3d, at 341, 175 Cal. Rptr., at 474. Moreover, the court noted, the Board's regulation "merely authorizes and does not compel savings and loan associations to include a due-on-sale clause in their loan contracts and to exercise their rights thereunder." *Ibid.*, 175 Cal. Rptr., at 475. The Court of Appeal likewise discovered no conflict between the *Wellenkamp* doctrine and the purposes of the HOLA because both were designed to assist financially distressed homeowners.

The court derived "further support," 121 Cal. App. 3d, at 342, 175 Cal. Rptr., at 475, for its decision from ¶ 15, which was included in two of the deeds of trust and which provided that the deeds would be "governed by the law of the jurisdic-

---

[7] In addition, the Court of Appeal noted that two of the three deeds of trust at issue were executed prior to the effective date of § 545.8–3(f). Therefore, the court reasoned, the Board's due-on-sale regulation was not applicable to those loan instruments and could not pre-empt state law with respect to those deeds. See 121 Cal. App. 3d, at 344, 345, 175 Cal. Rptr., at 476–477.

tion in which the Property is located." See n. 5, *supra*. That language, the court ruled, evinced an unmistakable intent that state law should govern the interpretation, validity, and enforcement of the deeds.[8]

The California Supreme Court denied appellants' petition for review. App. to Juris. Statement 28a.

Because the majority of courts to consider the question have concluded, in contrast to the decision of the Court of Appeal, that the Board's regulations, including § 545.8–3(f), do pre-empt state regulation of federal savings and loans,[9] we noted probable jurisdiction. 455 U. S. 917 (1982).

---

[8] The Court of Appeal refused to ascribe any weight to the absence of ¶ 15 in the third deed of trust at issue here. The court described its earlier discussion of ¶ 15 as

"not based so much on an agreement between the parties for the application of state law as on the conclusion that the general use of a provision containing such language by federal savings and loan associations with the approval of the Board persuasively evidences a recognition by the Board and federal savings and loan associations that state law would govern the interpretation, validity and enforcement of security instruments." *Id.*, at 346, 175 Cal. Rptr., at 477.

Nor did the court find significant the fact that this deed covered commercial rather than residential property.

[9] A number of Federal District Courts have concluded that the Board's due-on-sale regulation pre-empts state law. See, *e. g., Price* v. *Florida Federal Sav. & Loan Assn.*, 524 F. Supp. 175, 178 (MD Fla. 1981) (§ 545.8–3(f) is pre-emptive of any state regulation); *First Federal Sav. & Loan Assn.* v. *Peterson*, 516 F. Supp. 732, 740 (ND Fla. 1981) (§ 545.8–3(f) pre-empts Florida due-on-sale restrictions similar to those imposed by California); *Dantus* v. *First Federal Sav. & Loan Assn.*, 502 F. Supp. 658, 661 (Colo. 1980) (analogous ruling with respect to Colorado law); *Bailey* v. *First Federal Sav. & Loan Assn.*, 467 F. Supp. 1139, 1141 (CD Ill. 1979) (§ 545.8–3(f) forecloses any state regulation of due-on-sale practices of federal savings and loans), appeal dism'd, 636 F. 2d 1221 (CA7 1980); *Glendale Federal Sav. & Loan Assn.* v. *Fox*, 459 F. Supp. 903, 907 (CD Cal. 1978) (same), final summary judgment granted, 481 F. Supp. 616 (1979), order reversing and remanding, 663 F. 2d 1078 (CA9 1981), cert. pending, No. 81–1192. One court appears to have agreed with the California Court of Appeal. See *Holiday Acres No. 3* v. *Midwest Federal Sav. & Loan Assn.*,

## II

The pre-emption doctrine, which has its roots in the Supremacy Clause, U. S. Const., Art. VI, cl. 2, requires us to examine congressional intent. Pre-emption may be either

---

308 N. W. 2d 471 (Minn. 1981) (§ 545.8–3(f) does not pre-empt state regulation of due-on-sale clauses).

In addition, at least three Federal Courts of Appeals, several District Courts, and one State Supreme Court have ruled that various other Board regulations supersede state law. See, e. g., *Conference of Federal Sav. & Loan Assns.* v. *Stein*, 604 F. 2d 1256, 1260 (CA9 1979) ("In our judgment the regulatory control of the Bank Board over federal savings and loan associations is so pervasive as to leave no room for state regulatory control"), summarily aff'd, 445 U. S. 921 (1980); *First Federal Sav. & Loan Assn.* v. *Greenwald*, 591 F. 2d 417, 425–426 (CA1 1979) (Board regulation specifying the conditions under which federal savings and loans must pay interest on escrow accounts pre-empts state law imposing greater interest requirements); *Kupiec* v. *Republic Federal Sav. & Loan Assn.*, 512 F. 2d 147, 150–152 (CA7 1975) (Board regulation supersedes any common-law right to inspect savings and loan's membership list); *Meyers* v. *Beverly Hills Federal Sav. & Loan Assn.*, 499 F. 2d 1145, 1147 (CA9 1974) (Board regulation pre-empts the field of prepayments of real estate loans to federal associations); *Rettig* v. *Arlington Heights Federal Sav. & Loan Assn.*, 405 F. Supp. 819 (ND Ill. 1975) (Board regulations and policy statements pre-empt the field of fiduciary duties of federal savings and loan officers); *Lyons Sav. & Loan Assn.* v. *Federal Home Loan Bank Bd.*, 377 F. Supp. 11 (ND Ill. 1974) (Board regulation displaces state law regarding branching of federal savings and loans); *People* v. *Coast Federal Sav. & Loan Assn.*, 98 F. Supp. 311, 318 (SD Cal. 1951) (federal regulation of savings and loans pre-empts the field); *Kaski* v. *First Federal Sav. & Loan Assn.*, 72 Wis. 2d 132, 141–142, 240 N. W. 2d 367, 373 (1976) (federal law supersedes state regulation of federal savings and loans' lending practices). But see *Derenco, Inc.* v. *Benjamin Franklin Federal Sav. & Loan Assn.*, 281 Ore. 533, 577 P. 2d 477 (Board regulation authorizing federal savings and loans to maintain reserve accounts for tax and insurance payments does not occupy the field of reserve accounts or pre-empt state law requiring payment of interest on such accounts), cert. denied, 439 U. S. 1051 (1978). Cf. *Gulf Federal Sav. & Loan Assn.* v. *Federal Home Loan Bank Bd.*, 651 F. 2d 259, 266 (CA5 1981) (Board has authority only over internal management of federal savings and loans, and not over disputed loan agreement provisions), cert. pending, No. 81–1744.

express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977). Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be inferred because "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947).

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See also *Jones* v. *Rath Packing Co.*, 430 U. S., at 526; *Bethlehem Steel Co.* v. *New York Labor Relations Bd.*, 330 U. S. 767, 773 (1947). These principles are not inapplicable here simply because real property law is a matter of special concern to the States: "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Free* v. *Bland*, 369 U. S. 663, 666 (1962); see also *Ridgway* v. *Ridgway*, 454 U. S. 46, 54–55 (1981).

Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to

judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. *United States* v. *Shimer*, 367 U. S. 374, 381–382 (1961). When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited:

> "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.*, at 383.

See also *Blum* v. *Bacon*, 457 U. S. 132, 145–146 (1982); *Ridgway* v. *Ridgway*, 454 U. S., at 57 (regulations must not be "unreasonable, unauthorized, or inconsistent with" the underlying statute); *Free* v. *Bland*, 369 U. S., at 668.

A pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover, whether the administrator failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive. See *United States* v. *Shimer*, 367 U. S., at 381–383. Thus, the Court of Appeal's narrow focus on Congress' intent to supersede state law was misdirected. Rather, the questions upon which resolution of this case rests are whether the Board meant to pre-empt California's due-on-sale law, and, if so, whether that action is within the scope of the Board's delegated authority.

### III

As even the Court of Appeal recognized, the Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan "continues to have the power" to include a due-on-sale clause in a loan instrument and to enforce that clause "at its option." 12 CFR § 545.8–3(f) (1982). The California courts, in contrast, have limited a federal association's right

to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security.

The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. The Board consciously has chosen not to mandate use of due-on-sale clauses "because [it] desires to afford associations the flexibility to accommodate special situations and circumstances." 12 CFR § 556.9(f)(1) (1982).[10] Although compliance with both § 545.8–3(f) and the *Wellenkamp* rule may not be "a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S., at 142–143, the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely "at its option" and have deprived the lender of the "flexibility" given it by the Board.

Moreover, the Board recently has "reiterat[ed] its long-standing policy" of authorizing federal savings and loan associations to enforce due-on-sale clauses "subject only to express limitations imposed by the Board." 46 Fed. Reg. 39123, 39124 (1981). The only restrictions specified in the Board's regulation are contained in 12 CFR § 545.8–3(g) (1982).[11] That provision, unlike the *Wellenkamp* doctrine,

---

[10] As a practical matter, however, few mortgage instruments are written without due-on-sale clauses. The Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association, which purchase the bulk of mortgages sold in the secondary mortgage market, both require, in the mortgages they buy, either a due-on-sale clause or a provision enabling the lender to demand payment of the loan in seven years. The marketability of a mortgage in the secondary market is critical to a savings and loan, for it thereby can sell mortgages to obtain funds to make additional home loans. See *Schott* Advisory Opinion, at 28–34; Kinzler, Due-on-Sale Clauses: The Economic and Legal Issues, 43 U. Pitt. L. Rev. 441, 452–453 (1982); Comment, 9 Fla. State L. Rev. 645, 646, 650 (1981).

[11] Title 12 CFR § 545.8–3(g) (1982), which applies to loans made after July 31, 1976, and secured by a home occupied or to be occupied by the borrower, prohibits the exercise of a due-on-sale clause in the same four

does not confine a federal association's right to accelerate a loan to cases where the lender's security is impaired. In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate towards current market rates—a due-on-sale practice the Board has approved and views as critical to "the financial stability of the association." See *Schott* Advisory Opinion, at 27.

By further limiting the availability of an option the Board considers essential to the economic soundness of the thrift industry, the State has created "an obstacle to the accomplishment and execution of the full purposes and objectives" of the due-on-sale regulation. *Hines* v. *Davidowitz*, 312 U. S., at 67. Cf. *Franklin Nat. Bank* v. *New York*, 347 U. S. 373, 378 (1954) (finding a "clear conflict" between federal law, which authorized national banks to receive savings deposits but did not specifically permit—much less require—advertising by such banks, and New York law, which forbade them to use the word "savings" in their advertising or business).

Contending that the *Wellenkamp* doctrine is not inconsistent with the due-on-sale regulation, however, appellees point to the regulation's second sentence, which provides in pertinent part:

> "[E]xercise by the association of such option (hereafter called a due-on-sale clause) shall be exclusively governed by the terms of the loan contract, and all rights and rem-

---

circumstances listed in ¶ 17 of the uniform mortgage instrument, see n. 2, *supra:* when a lien subordinate to the lender's security instrument is created; when a purchase money security interest for household appliances is created; when a transfer occurs by devise, descent, or operation of law on the death of a joint tenant; or when a leasehold interest of not more than three years is granted with no option to purchase. Section 545.8–3(g) also bars the association from imposing a prepayment penalty when a loan is accelerated by means of a due-on-sale clause, and provides that, under specified circumstances, the lender waives its option to exercise a due-on-sale provision.

edies of the association and borrower shall be fixed and governed by that contract." 12 CFR § 545.8–3(f) (1982).

Appellees interpret this language as incorporating state contract law—and therefore any state law restricting the exercise of a due-on-sale clause. We note, however, that the incorporation of state law does not signify the inapplicability of federal law, for "a fundamental principle in our system of complex national polity" mandates that "the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Hauenstein* v. *Lynham*, 100 U. S. 483, 490 (1880). See also *Testa* v. *Katt*, 330 U. S. 386, 390–392 (1947).[12] Moreover, in our view, the second sentence of § 545.8–3(f) simply makes clear that the regulation does not empower federal savings and loans to accelerate a loan upon transfer of the security property unless the parties to the particular loan instrument, as a matter of contract, have given the lender that right. Similarly, if the parties to a given contract agree somehow to limit the association's right to exercise a due-on-sale provi-

---

[12] This principle likewise leads us to reject appellees' contention that, with respect to the two deeds of trust containing ¶ 15, see n. 5, *supra*, appellants did in fact agree to be bound by local law. Paragraph 15 provides that the deed is to be governed by the "law of the jurisdiction" in which the property is located; but the "law of the jurisdiction" includes federal as well as state law.

Moreover, like ¶ 17—the due-on-sale clause in the uniform mortgage instrument, see n. 2, *supra*—¶ 15 typically must be included in any mortgage the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association purchases in the secondary mortgage market. See n. 10, *supra*. Paragraph 15 was added to the uniform mortgage instrument not to elevate state law over federal law, but to provide a uniform choice-of-law provision to be used when interstate disputes arose regarding the interpretation of a mortgage. See App. to Brief for Federal Home Loan Bank Board and Federal Home Loan Mortgage Corporation as *Amici Curiae* 2a (letter from Henry L. Judy, General Counsel, Federal Home Loan Mortgage Corporation); see also S. Rep. No. 91–761, p. 25 (1970) (letter from Arthur F. Burns, Chairman of the Board of Governors, Federal Reserve System).

sion, the second sentence of § 545.8–3(f) precludes the lender from relying on the first sentence as authorizing more expansive use of the clause.

Any ambiguity in § 545.8–3(f)'s language is dispelled by the preamble accompanying and explaining the regulation. The preamble unequivocally expresses the Board's determination to displace state law:

> "Finally, it was and is the Board's intent to have . . . due-on-sale practices of Federal associations governed *exclusively* by Federal law. Therefore, . . . exercise of due-on-sale clauses by Federal associations shall be governed and controlled *solely* by [§ 545.8–3] and the Board's new Statement of Policy. *Federal associations shall not be bound by or subject to any conflicting State law which imposes different . . . due-on-sale requirements*, nor shall Federal associations attempt to . . . avoid the limitations on the exercise of due-on-sale clauses delineated in [§ 545.8–3(g)] on the ground that such . . . avoidance of limitations is permissible under State law." 41 Fed. Reg. 18286, 18287 (1976) (emphasis added).[13]

In addition, the Board recently has "confirm[ed]" that the due-on-sale practices of federal savings and loans "shall be governed exclusively by the Board's regulations in preemption of and without regard to any limitations imposed by state law on either their inclusion or exercise." 12 CFR

---

[13] Citing *Chrysler Corp.* v. *Brown,* 441 U. S. 281, 315–316 (1979), appellees characterize the preamble as an interpretative regulation that does not have the binding force of law and therefore cannot pre-empt state law. But *Chrysler Corp.* is not on point because we conclude that § 545.8–3(f) itself supersedes contrary state due-on-sale law; we look to the preamble only for the administrative construction of the regulation, to which "deference is . . . clearly in order." *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). We need not consider, therefore, the pre-emptive effect of the preamble standing alone.

§ 556.9(f)(2) (1982). Thus, we conclude that the Board's due-on-sale regulation was meant to pre-empt conflicting state limitations on the due-on-sale practices of federal savings and loans, and that the California Supreme Court's decision in *Wellenkamp* creates such a conflict.[14]

## IV

The question remains whether the Board acted within its statutory authority in issuing the pre-emptive due-on-sale regulation. The language and history of the HOLA convince us that Congress delegated to the Board ample authority to regulate the lending practices of federal savings and loans so as to further the Act's purposes, and that § 545.8–3(f) is consistent with those purposes.

## A

The HOLA, a product of the Great Depression of the 1930's, was intended "to provide emergency relief with respect to home mortgage indebtedness" at a time when as many as half of all home loans in the country were in default. H. R. Conf. Rep. No. 210, 73d Cong., 1st Sess., 1 (1933). See 77 Cong. Rec. 2499 (1933) (remarks of Rep. Hancock); *id.*, at 2570 (remarks of Rep. Reilly); Home Owners' Loan Act: Hearings on S. 1317 before a Subcommittee of the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 9 (1933) (Senate Hearings) (statement of Horace Russell, one of the drafters of the bill and General Counsel, Federal Home Loan Bank Board, Atlanta, Ga.). Local institutions that had previously supplied funds to finance homes had ceased doing business or had discontinued such long-term loans, so that more than half the counties in the country, containing almost one-fifth of the

---

[14] Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the entire field of federal savings and loan regulation.

total population, were without home-financing institutions. See *id.*, at 7, 19; see also H. R. Rep. No. 55, 73d Cong., 1st Sess., 2 (1933); S. Rep. No. 91, 73d Cong., 1st Sess., 2 (1933); Home Owners' Loan Act: Hearings on H. R. 4980 before the House Committee on Banking and Currency, 73d Cong., 1st Sess., 16–17 (1933) (House Hearings) (statement of William F. Stevenson, Chairman, Federal Home Loan Bank Board); Comment, 11 Pac. L. J. 1085, 1103 (1980) (by 1933, 1,700 state-chartered savings and loans had failed, causing losses of some $200 million, about one-third the value of savings in these associations).

In order to ameliorate these conditions, Congress enacted the HOLA, "a radical and comprehensive response to the inadequacies of the existing state systems." *Conference of Federal Sav. & Loan Assns. v. Stein*, 604 F. 2d 1256, 1257 (CA9 1979), summarily aff'd, 445 U. S. 921 (1980). The Act provided for the creation of a system of federal savings and loan associations, which would be regulated by the Board so as to ensure their vitality as "permanent associations to promote the thrift of the people in a cooperative manner, to finance their homes and the homes of their neighbors." S. Rep. No. 91, 73d Cong., 1st Sess., 2 (1933); see also H. R. Rep. No. 55, 73d Cong., 1st Sess., 2 (1933); 77 Cong. Rec. 4974 (1933) (remarks of Sen. Bulkley).

Thus, in § 5(a) of the Act, Congress gave the Board plenary authority to issue regulations governing federal savings and loans:

> "In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, *operation*, and *regulation* of associations to be known as 'Federal Savings and Loan Associations', or 'Federal mutual savings banks' . . . , and to issue charters there-

for, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States." 12 U. S. C. § 1464(a)(1) (1976 ed., Supp. IV) (emphasis added).

The broad language of § 5(a) expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans. As one court put it, "[i]t would have been difficult for Congress to give the Bank Board a broader mandate." *Glendale Federal Sav. & Loan Assn.* v. *Fox*, 459 F. Supp. 903, 910 (CD Cal. 1978), final summary judgment granted, 481 F. Supp. 616 (1979), order reversing and remanding, 663 F. 2d 1078 (CA9 1981), cert. pending, No. 81–1192. And Congress' explicit delegation of jurisdiction over the "operation" of these institutions must empower the Board to issue regulations governing mortgage loan instruments, for mortgages are a central part of any savings and loan's "operation." See *Schott* Advisory Opinion, at 21; House Hearings 16 (Apr. 20, 1933) (statement of William F. Stevenson, Chairman, Federal Home Loan Bank Board) ("We are loaning [savings associations] seven million dollars a week and they are lending it pretty largely on homes of the type contemplated in the Act"); Tr. of Oral Arg. 4 (approximately 78% of savings and loan associations' assets are invested in mortgage loan contracts).

Moreover, Congress directed that, in regulating federal savings and loans, the Board consider "the best practices of local mutual thrift and home-financing institutions in the United States," which were at that time all state-chartered. § 5(a) of the HOLA, 12 U. S. C. § 1464(a). By so stating, Congress plainly envisioned that federal savings and loans would be governed by what the Board—not any particular State—deemed to be the "best practices." See also *First Federal Sav. & Loan Assn.* v. *Massachusetts Tax Comm'n*, 437 U. S. 255, 258, n. 3 (1978) (observing that the HOLA "protects federal associations from being forced into the state

regulatory mold"). Thus, the statutory language suggests that Congress expressly contemplated, and approved, the Board's promulgation of regulations superseding state law.

Appellees, however, point to the various sections of the HOLA explicitly pre-empting[15] and incorporating[16] state law, and contend that the Board has no additional authority to adopt regulations displacing state law. Although Congress made decisions about the applicability of certain aspects of state law to federal savings and loans, these provisions do not imply that Congress intended no further pre-emption of state law. Rather, Congress invested the Board with broad authority to regulate federal savings and loans so as to effect the statute's purposes, and plainly indicated that the Board need not feel bound by existing state law. § 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV). We cannot read this broad delegation of power as confining the Board's authority to pre-empt state law to those areas "specifically described by the Act's other provisions." *United*

---

[15] See § 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV) (exempting federal mutual savings banks formerly organized under state law from "any numerical limitations of State law on the establishment of branch offices and other facilities"); and § 5(h) of the Act, § 1464(h) (pre-empting state taxes on federal savings and loans greater than those imposed on "other similar local mutual or cooperative thrift and home financing institutions"). Cf. § 13 of the Federal Home Loan Bank Act, 12 U. S. C. § 1433 (exempting Federal Home Loan Bank bonds from taxation).

[16] See § 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV) (providing that any federal mutual savings bank which was formerly a state-chartered institution is subject to state laws pertaining to discrimination in lending based on neighborhood or geographic area, and to requirements imposed under the Consumer Credit Protection Act, 15 U. S. C. § 1601 *et seq.*); § 5(b)(3) of the Act, § 1464(b)(3) (1976 ed., Supp. IV) (authorizing federal savings and loans to borrow funds from a state mortgage finance agency "to the same extent as" state law permits state-chartered savings and loans to do so); and § 5(c)(4)(A) of the Act, § 1464(c)(4)(A) (1976 ed., Supp. IV) (permitting federal associations to invest in, or lend to, any business development credit corporation incorporated in the State "to the same extent as" state-chartered savings and loans are authorized to do so).

*States* v. *Southwestern Cable Co.*, 392 U. S. 157, 172 (1968); see also *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 193–194 (1941).

Furthermore, if federal savings and loans were expected to conform to state law except where explicitly pre-empted in the Act itself, the provisions incorporating specific aspects of state law were needlessly repetitive. We decline to construe the Act so as to render these provisions nugatory, "thereby offending the well-settled rule that all parts of a statute, if possible, are to be given effect." *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 513 (1981). See also *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307–308 (1961); cf. *Franklin Nat. Bank* v. *New York*, 347 U. S., at 378 ("We find no indication that Congress intended to make this phase of national banking [*i. e.*, advertising] subject to local restrictions, as it has done by express language in several other instances").[17]

## B

Because of the exigencies of the times, the HOLA was enacted hurriedly and its legislative history, concededly, is somewhat sparse.[18] But that history does confirm our read-

---

[17] Likewise, we find nothing in § 8 of the Federal Home Loan Bank Act of 1932, 12 U. S. C. § 1428, relied on by the dissent, see *post*, at 173, that suggests any limit on the Board's authority to issue regulations pre-empting state law. That provision, which is not even part of the HOLA, speaks only to the Board's authority to examine state laws governing the operation of federal home loan banks, not federal savings and loans, for the purpose of ensuring "[a]dequate protection to a Federal Home Loan Bank in making or collecting advances under th[at] chapter . . . ." 12 U. S. C. § 1428. It does not purport to constrict the Board's power to regulate the operations of federal savings and loans and does not negate the explicit language and history of the HOLA.

[18] On April 13, 1933, President F. D. Roosevelt wrote Congress, asking for "legislation to protect small home owners from foreclosure and to relieve them of a portion of the burden of excessive interest and principal payments incurred during the period of higher values and higher earning power." H. R. Doc. No. 19, 73d Cong., 1st Sess., 1 (1933). Hearings were held by the House Committee on Banking and Currency on April 20

ing of the statutory language and the Board's plenary authority to regulate the operations of federal savings and loans. Attempting to provide for the "relief of the man who is about to lose his home," Congress set out the general framework and left many of the details to the Board. House Hearings 13 (Apr. 20, 1933) (statement of William F. Stevenson, Chairman, Federal Home Loan Bank Board). Thus, references to the Board's broad discretion to regulate the newly created federal savings and loans appear throughout the legislative history. Nowhere is there a suggestion of any intent somehow to limit the Board's authority.

Chairman Stevenson's testimony during the HOLA hearings suggests that the Act contemplated that federal law would govern the terms of the loan instruments used by federal savings and loans. Discussing § 5(c) of the HOLA, as amended, 12 U. S. C. § 1464(c), Representative Hancock noted: "You are departing from uniformity with respect to loan associations throughout the United States when you say that the thrift associations cannot loan on a piece of real estate in excess of $20,000." House Hearings 14 (Apr. 21, 1933). The Chairman replied: "That may be true. We are departing in a good many ways. We have a good many [thrift associations] that are in dire straits because they have loaned on property way up yonder in value, and they have their money tied up in hotels, apartment houses and things of that kind, which puts them in a desperate situation." *Ibid.*

Similarly, in response to concern expressed during the Senate hearings that the Act did not prohibit borrowers from obtaining financing and then renting the property, Chairman Stevenson observed: "That would be a matter of regulation. That could be covered by regulation under the bill." Senate

---

and 21, 1933, and by the Senate Committee on Banking and Currency on April 20 and 22. The bill was approved by the House on April 28, see 77 Cong. Rec. 2585, and passed the Senate on June 5, see *id.*, at 4995. The President signed the bill into law on June 9, 1933, see *id.*, at 6198, less than two months after he had first requested the legislation.

Hearings 14. Asked whether the Board would have author-
ity to promulgate such a regulation, Stevenson replied:

> "If the Federal Home Loan Bank Board should choose to
> make that kind of a regulation it could put that in. A
> great many of these local private institutions would put
> that kind of a clause in their loans." *Ibid.*

See also House Hearings 5 (Apr. 20, 1933) (statement of
Chairman Stevenson) (referring to "the regulations as to the
use of the property after the loan is once obtained"); *id.*, at 9
(Apr. 21, 1933) (statement of Mr. Stevenson) ("[I]t is in the
discretion of the Board when it will grant [a 3-year] exten-
sion [of loan payments]"); *id.*, at 18–19 (colloquy between
Mr. Stevenson and Rep. Reilly) (noting that the Board
has discretion in determining whether to charter a federal
association).

The subsequent debates confirm that Congress accepted
Chairman Stevenson's offer and furnished the Board with
broad power to regulate the federal savings and loans.
Thus, Representative Luce, ranking minority member of the
House Committee on Banking and Currency, observed that
the federal savings and loan associations "will be formed
in accordance with the best building-and-loan practice, and
I feel sure we may rely upon [Chairman Stevenson] and
his Board to carry out that promise." 77 Cong. Rec. 2480
(1933). "It is contemplated by the bill before us to put the
machinery in the hands of the Home Loan Bank Board," and
"[w]e give the board great power to administer the act," Rep-
resentative Luce continued. *Id.*, at 2480, 2481. See also
*id.*, at 2481 ("We leave such things [as limitations on conver-
sion of federal home loan banks to federal savings and loans]
to the judgment of the board"); *id.*, at 2501 ("The prudent
course is to leave this to the judgment of the board, by impos-
ing a maximum [rate of interest] in the bill—4 percent upon
what we borrow, 5 percent upon what we lend—and trust
this Board . . . to get lower rates for borrowing or make

lower rates for lending as the opportunity may come"); *id.*, at 4987 (colloquy between Sens. Hebert and Bulkley) (observing that the Board has discretion in determining when savings and loans should be chartered in areas with existing local thrift institutions).

Thus, the HOLA did not simply incorporate existing local loan practices. Rather, Congress delegated to the Board broad authority to establish and regulate "a uniform system of [savings and loan] institutions where there are not any now," and to "establish them with the force of the government behind them, with a national charter." House Hearings 15 (Apr. 21, 1933) (statement of Chairman Stevenson); *id.*, at 17 (Apr. 20, 1933).[19]   And the Board has exercised

---

[19] The postenactment history of the HOLA corroborates the Board's broad authority to regulate the lending practices of federal savings and loans. As part of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. 95–630, 92 Stat. 3641, Congress amended § 5(a) of the HOLA to permit state mutual savings banks to obtain federal charters. During debate in the House, Representative Hanley introduced an amendment providing that those mutual savings banks opting to convert to federally chartered institutions would continue to be subject to state law pertaining to lending discrimination and to regulations imposed under the Consumer Credit Protection Act, 82 Stat. 146, as amended, 15 U. S. C. § 1601 *et seq.*, if the Board determined that state law imposed more stringent requirements than federal law. See 124 Cong. Rec. 33847 (1978).

Representative Hanley explained: "In no way, of course, would the use of State law requirements for Federal mutual savings banks be interpreted to erode the Bank Board's long-standing plenary authority over Federal savings and loan associations; Federal law alone would continue to govern these institutions in such areas as branching, anti-discrimination, and lending authority." *Id.*, at 33848. Representative St Germain, chairman of the Subcommittee on Financial Institutions Supervision, Regulation, and Insurance of the House Committee on Banking, Finance, and Urban Affairs and chief sponsor of the bill, agreed: "This restriction applies only to converted mutual savings banks, and Congress in no way intends to interfere with the longstanding, all-inclusive power of the Bank Board over the activities of Federal savings and loan associations, including branching authority." *Id.*, at 33849. The amendment was agreed to. *Ibid.*

Similar views were expressed during the Senate debate on the bill. Senator Brooke observed that "we do not intend to interfere with the Bank

that discretion, regulating comprehensively the operations of these associations, including their lending practices and, specifically, the terms of loan instruments.[20]

## C

As we noted above, a savings and loan's mortgage lending practices are a critical aspect of its "operation," over which the Board unquestionably has jurisdiction. Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion. We have no difficulty concluding that the due-on-sale regulation is within the scope of the Board's authority under the HOLA and consistent with the Act's principal purposes.

---

Board's plenary authority over Federal savings and loan associations, and in this area, Federal law alone would continue to govern." *Id.*, at 36148.

Then, during debate in the House on the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. 96–221, 94 Stat. 132, one Congressman expressed concern that permitting federal savings and loans to make residential real estate loans to the same extent national banking associations were authorized to do so might be interpreted as making "federal savings and loans . . . subject to State requirements." 126 Cong. Rec. 6981 (1980) (remarks of Rep. Patterson). Representative St Germain responded that the Act would expand the federal associations' investment powers "[o]nly if the Federal Home Loan Bank Board permits. Under the Home Owners' Act, the Bank Board has complete authority to determine by regulation the lending practices of Federal associations." *Ibid.*

Although these postenactment events cannot be accorded the weight of contemporary history, they do provide further confirmation of Congress' intent to delegate to the Board broad discretion in regulating the lending practices of federal savings and loans. See *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969).

[20] The Board's extensive regulations govern, for example, fair credit requirements, the types and amount of loans, collateral required, repayment schedules, initial loan charges, assignment of rents, escrow accounts and interest paid on those accounts, late charges, servicing of loans, and loan payments and prepayments. See 12 CFR §§ 545.6, 545.8 (1982).

Congress delegated power to the Board expressly for the purpose of creating and regulating federal savings and loans so as to ensure that they would remain financially sound institutions able to supply financing for home construction and purchase. Thus, in testifying during the House hearings on the HOLA, the Board's Chairman observed: "The new corporations that we propose to set up, we want them set up on a sound basis as they will be of very material assistance in home financing for all time, if properly managed." House Hearings 12 (Apr. 21, 1933). And the relevant House and Senate Reports referred to the federal associations as "permanent" institutions. S. Rep. No. 91, 73d Cong., 1st Sess., 2 (1933); H. R. Rep. No. 55, 73d Cong., 1st Sess., 2 (1933).

The due-on-sale regulation was promulgated with these purposes in mind. The Board has determined that due-on-sale clauses are "a valuable and often an indispensable source of protection for the financial soundness of Federal associations and for their continued ability to fund new home loan commitments." 12 CFR § 556.9(f)(1) (1982). Specifically, the Board has concluded that the due-on-sale clause is "an important part of the mortgage contract" and that its elimination "will have an adverse [e]ffect on the earning power and financial stability of Federal associations, will impair the ability of Federal associations to sell their loans in the secondary markets, will reduce the amount of home-financing funds available to potential home buyers, and generally will cause a rise in home loan interest rates." Schott Advisory Opinion, at 2, 17–18.

The Board's analysis proceeds as follows: It observes that the federal associations' practice of borrowing short and lending long—obtaining funds on a short-term basis and investing them in long-term real estate loans, which typically have a 25- to 30-year term—combined with rising interest rates, has increased the cost of funds to these institutions and reduced their income. Exercising due-on-sale clauses enables savings and loans to alleviate this problem by replacing long-

term, low-yield loans with loans at the prevailing interest rates and thereby to avoid increasing interest rates across the board. See *id.*, at 21–22. Moreover, the Board has determined that restrictions like the *Wellenkamp* doctrine lengthen the expected maturity date of a lender's mortgages, thus reducing their marketability in the secondary mortgage market. As a result, the Board fears, "the financial stability of Federal associations in California will be eroded and the flow of home loan funds into California will be reduced." *Schott* Advisory Opinion, at 34.[21]

Admittedly, the wisdom of the Board's policy decision is not uncontroverted.[22] But neither is it arbitrary or capricious. As judges, it is neither our function, nor within our

---

[21] The Board's Due-on-Sale Task Force estimates that the California Supreme Court's restrictions on the exercise of due-on-sale clauses accounted for 40% of the total losses suffered in 1981 by state-chartered associations in the State—some $200 million. See Federal Home Loan Bank Board, Due-on-Sale Task Force Report 2, 15 (1982). The Task Force projects that imposition of such restrictions nationwide would create, within two years, annual losses of $600 to $800 million for federal savings and loans, and $1 to $1.3 billion for all federal and state associations. See *id.*, at 2, 18, 25.

[22] Those subscribing to the opposite view contend that the unrestricted exercise of due-on-sale clauses may preclude the assumption of mortgages at lower interest rates, thus preventing the sale of homes and transferring the burden of an inflationary market from the lender to the homeowner and prospective homeowner. See, *e. g., Patton* v. *First Federal Sav. & Loan Assn.*, 118 Ariz. 473, 578 P. 2d 152 (1978); *Wellenkamp* v. *Bank of America*, 21 Cal. 3d 943, 582 P. 2d 970 (1978); *Nichols* v. *Ann Arbor Federal Sav. & Loan Assn.*, 73 Mich. App. 163, 250 N. W. 2d 804 (1977).

A number of courts, however, have agreed with the Board's approach. See, *e. g., Williams* v. *First Federal Sav. & Loan Assn.*, 651 F. 2d 910 (CA4 1981); *Tierce* v. *APS Co.*, 382 So. 2d 485 (Ala. 1979); *Malouff* v. *Midland Federal Sav. & Loan Assn.*, 181 Colo. 294, 509 P. 2d 1240 (1973); *Martin* v. *Peoples Mutual Sav. & Loan Assn.*, 319 N. W. 2d 220 (Iowa 1982); *Occidental Savings & Loan Assn.* v. *Venco Partnership*, 206 Neb. 469, 293 N. W. 2d 843 (1980); *Crockett* v. *First Federal Sav. & Loan Assn.*, 289 N. C. 620, 224 S. E. 2d 580 (1976); *Gunther* v. *White*, 489 S. W. 2d 529 (Tenn. 1973).

expertise, to evaluate the economic soundness of the Board's approach. In promulgating the due-on-sale regulation, the Board reasonably exercised the authority, given it by Congress, so as to ensure the financial stability of "local mutual thrift institutions in which people . . . invest their funds and . . . [which] provide for the financing of homes." § 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV).[23] By so doing, the Board intended to pre-empt conflicting state restrictions on due-on-sale practices like the California Supreme Court's *Wellenkamp* doctrine.

Our inquiry ends there. Accordingly, we hold that the Board's due-on-sale regulation bars application of the *Wellenkamp* rule to federal savings and loan associations.[24] The judgment of the Court of Appeal is reversed.

*It is so ordered.*

---

[23] We therefore reject appellees' contention that the Board's power to regulate federal savings and loans extends only to the associations' internal management and not to any external matters, such as their relationship with borrowers. Although one federal and one state court have drawn this distinction, see *Gulf Federal Sav. & Loan Assn.* v. *Federal Home Loan Bank Bd.*, 651 F. 2d, at 266; *Holiday Acres No. 3* v. *Midwest Federal Sav. & Loan Assn.*, 308 N. W. 2d, at 478, we find no support in the language of the HOLA or its legislative history for such a restriction on the Board's authority.

Moreover, whatever validity the distinction has in theory, it makes little sense here. As the Wisconsin Supreme Court recognized, "[t]he regulation of loan practices directly affects the internal management and operations of federal associations and therefore requires uniform federal control." *Kaski* v. *First Federal Sav. & Loan Assn.*, 72 Wis. 2d, at 142, 240 N. W. 2d, at 373. In fact, as discussed in the text, the Board's due-on-sale policy is based on the view that due-on-sale clauses are essential to the financial soundness of federal savings and loans; preservation of the associations' very existence is obviously related to their internal management and is one of the functions delegated to the Board by Congress.

[24] Pointing out that two of the deeds of trust were executed prior to the 1976 effective date of § 545.8–3(f), appellees argue that the due-on-sale regulation may not be applied so as to destroy vested rights. Therefore, appellees reason, California law does not conflict with federal law with respect to those two deeds. Appellants respond that § 545.8–3(f) did not in-

JUSTICE POWELL took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, concurring.

I join in the Court's opinion but write separately to emphasize that the authority of the Federal Home Loan Bank Board to pre-empt state laws is not limitless.* Although Congress delegated broad power to the Board to ensure that federally chartered savings and loan institutions "would re-

terfere with appellees' rights because it merely codified pre-existing law. See n. 4, *supra*.

When the two deeds of trust were executed in 1971 and 1972, California law permitted the unrestricted exercise of due-on-sale clauses upon outright transfer of the security property, as occurred here. The Board's due-on-sale regulation was then issued in 1976, reinforcing Fidelity's right to enforce the due-on-sale provisions. Not until *Wellenkamp* was decided in 1978 was a lender's right under California law to accelerate a loan in response to an outright transfer limited to cases where the security was impaired. The California Supreme Court's prior cases, which forbade the automatic enforcement of due-on-sale provisions when the borrower further encumbered the property securing the loan, *La Sala* v. *American Savings & Loan Assn.*, 5 Cal. 3d 864, 489 P. 2d 1113 (1971), and when the borrower entered into an installment land contract covering all or part of the security property, *Tucker* v. *Lassen Savings & Loan Assn.*, 12 Cal. 3d 629, 526 P. 2d 1169 (1974), permitted the unrestricted exercise of due-on-sale clauses in cases of outright transfers of the security. See 5 Cal. 3d, at 880, 489 P. 2d, at 1123; 12 Cal. 3d, at 637–638, 526 P. 2d, at 1174–1175.

Because we find the *Wellenkamp* doctrine pre-empted by a previously promulgated federal regulation and therefore inapplicable to federal savings and loans, appellees are deprived of no vested rights if Fidelity is permitted to enforce the due-on-sale clauses in the two pre-1976 deeds: the savings and loan had the right to accelerate the loans, pursuant to California law, when the deeds were executed, and that power was never diminished by state law. We have no occasion, therefore, to consider whether § 545.8–3(f) may be applied so as to give a savings and loan broader authority to enforce a due-on-sale clause than it had when the deed of trust was executed, or to address appellants' contention that § 545.8–3(f) effected no change in the law.

*At one point in today's opinion, the Court states that "we need not decide whether the HOLA or the Board's regulations occupy . . . the entire field of federal savings and loan regulation." *Ante*, at 159, n. 14.

main financially sound," *ante,* at 168, it is clear that HOLA does not permit the Board to pre-empt the application of all state and local laws to such institutions. Nothing in the language of § 5(a) of HOLA, which empowers the Board to "provide for the organization, incorporation, examination, operation, and regulation" of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices. Accordingly, in my view, nothing in the Court's opinion should be read to the contrary.

JUSTICE REHNQUIST, with whom JUSTICE STEVENS joins, dissenting.

The Court today concludes that in § 5(a) of the Home Owners' Loan Act of 1933 (HOLA), 12 U. S. C. § 1464(a) (1976 ed., Supp. IV), Congress authorized the Federal Home Loan Bank Board to pre-empt by administrative fiat California's limitations upon the enforceability of "due-on-sale" clauses in real estate mortgages held by federal savings and loan institutions. The Court reaches this extraordinary result by concluding that due-on-sale clauses relate to a savings and loan's mortgage lending practices which "are a critical aspect of its 'operation' over which the Board unquestionably has jurisdiction." *Ante,* at 167. Because I conclude that Congress has not authorized the Board to promulgate a regulation such as 12 CFR § 545.8–3(f) (1982), I dissent.

Section 5(a) of the HOLA, 12 U. S. C. § 1464(a) (1976 ed., Supp. IV), unquestionably grants broad authority to the Board to regulate the mortgage lending practices of federal savings and loans. In order to perform this role, the Board may take into account state property and contract law which governs real estate transactions in general and the enforceability and interpretation of mortgage lending instruments in particular. Thus, it would be within the Board's power to determine that it constitutes an unsafe lending practice for a

federal savings and loan to conclude a real property mortgage without a fully enforceable due-on-sale clause.   It would be within the authority delegated to it by Congress for the Board to conclude that a due-on-sale clause must be included in a mortgage instrument as a means of enabling a federal savings and loan to remove unprofitable loans from its portfolio.

Such a regulation would be entirely consistent with the approach taken by Congress in regulating the savings and loan industry.   In § 8 of the Federal Home Loan Bank Act of 1932 (FHLBA), 12 U. S. C. § 1428, the precursor to HOLA, Congress has required the Board to examine state law "relating to the conveying or recording of land titles, or to homestead and other rights, or to *the enforcement of the rights of holders of mortgages on lands securing loans.*"   (Emphasis added.) Section 8 provides further:

> "If any such examination shall indicate, in the opinion of the board, that under the laws of any such State . . . there would be inadequate protection to a Federal Home Loan Bank in making or collecting advances under this chapter, the *board may withhold or limit the operation* of any Federal Home Loan Bank in such State until satisfactory conditions of law . . . shall be established."   12 U. S. C. § 1428 (emphasis added).

Thus, there is no indication in the FHLBA that the Board may, by promulgating regulations, pre-empt those state laws that are deemed to be economically unsound.   Instead, if the Board concludes that California's limitations upon the enforceability of due-on-sale clauses endangers the soundness of the system established by the HOLA and the FHLBA, then the response contemplated by Congress is for the Board to "withhold or limit the operation" of the system in California.

In declaring the due-on-sale clause enforceable as a matter of federal law, however, the Board has departed from the ap-

proach contemplated by Congress. Although Congress has authorized the Board to regulate the lending activities of federal savings and loan associations, there is no indication in the HOLA itself, or in its legislative history, that Congress has empowered the Board to determine whether and when federal law shall govern the enforceability of particular provisions contained in mortgages concluded by federal savings and loan associations. If anything, § 8 of the FHLBA indicates that it was Congress' understanding in 1932 that the enforceability of provisions in mortgages is a matter of state law. Contract and real property law are traditionally the domain of state law. *Aronson* v. *Quick Point Pencil Co.*, 440 U. S. 257, 262 (1979); *Butner* v. *United States*, 440 U. S. 48, 55 (1979). In the HOLA, Congress did not intend to create a federal common law of mortgages. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630 (1981).*

The Board's attempt to enforce due-on-sale clauses as a matter of federal law cannot be upheld as a regulation of mortgage lending practices of federal savings and loan associations. In § 545.8–3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. Instead, as the Court recognizes, *ante*, at 146–147, the Board's regulation purports to create a rule of law which will govern the rights and obligations of the parties to the mortgage instrument. This regulation does not simply delineate those provisions a federal savings and loan must or must not include in a mortgage instrument. Section 545.8–3(f) purports to guarantee the enforceability of a contractual provision notwithstanding state law to the contrary. In this case, the Board is not regulating the operation of federal savings and loan associa-

---

*The Board, however, has argued that federal common law does govern the contractual relationship between federal savings and loan institutions and their mortgagors. See *Gulf Federal Sav. & Loan* v. *Federal Home Loan Bank Bd.*, 651 F. 2d 259, 266 (CA5 1981), cert. pending, No. 81–1744; Brief for Federal Home Loan Bank Board et al. as *Amici Curiae* 26, n. 21.

tions, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws.

The limitations the California courts have placed upon the enforceability of due-on-sale clauses do not impair the ability of the Board to regulate the manner in which federal savings and loan associations engage in mortgage lending. California has not interfered with the Board's determination that it constitutes an unsafe lending practice for a federal savings and loan to enter a loan agreement without a fully enforceable due-on-sale clause. California's rule regarding due-on-sale clauses is not invalid pursuant to the Supremacy Clause simply because it makes it difficult for lenders to eliminate unprofitable mortgage loans from their portfolios.

Although the Board has concluded that the California courts' limitations upon the enforceability of due-on-sale clauses is economically unsound, I cannot agree that Congress has enabled the Board to insulate federal savings and loans from California mortgage law merely by promulgating a regulation that declares these clauses to be enforceable. Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the Federal Home Loan Bank Board to intrude into the domain of state property and contract law that Congress has left to the States.