JOSÉ A. LLAMA, ARTURO ORTIZ TORO, ZORAIDA CÓRDOVA, JOSÉ L. LLAMA, demandantes y recurridos, *v.* FIRST MORTGAGE INVESTORS, demandada y recurrente.

*Número:* R-82-94        *Resuelto:* 16 de febrero de 1983

*Julio L. Aguirre,* de *Fiddler, González & Rodríguez,* abogado de la recurrente; *W. R. Picorelli Osorio,* abogado de los recurridos.

PER CURIAM: Se nos plantea en el presente caso la validez de la cláusula de aceleración, conocida en el idioma inglés como *"due-on-sale"*, que se inserta en las escrituras sobre constitución de hipotecas en garantía de préstamos

para la adquisición de hogares, y que permite al acreedor, a su opción, dar por vencida la deuda y proceder a su cobro y ejecución de la hipoteca si el deudor vendiere la propiedad o un interés sobre la misma sin el consentimiento escrito del acreedor hipotecario.[1] La cláusula permite, en efecto, al acreedor hipotecario negociar con el propuesto adquirente la tasa de interés que éste pagará, tomando en consideración la tasa prevaleciente en el momento de hacer la transferencia objeto de la negociación. Como veremos, el campo ha sido ocupado por una ley del Congreso específicamente aplicable a Puerto Rico —la *Garn-St Germain Depository Institution Act of 1982*— y bajo las circunstancias aquí presentes venimos obligados a sostener la validez de dicha cláusula.

Los hechos aquí pertinentes pueden resumirse así: Los cónyuges don Arturo Ortiz Toro y doña Zoraida Córdova adquirieron por compra a First Mortgage Investors[2] un apartamento residencial en el Condominio Coral Beach, radicado en la municipalidad de Carolina, Puerto Rico. La transacción se efectuó por la cantidad de $76,600 mediante escritura pública otorgada el 20 de marzo de 1978. En la misma fecha se otorgó otra escritura en virtud de la cual los referidos cónyuges constituyeron primera hipoteca sobre la mencionada propiedad, para garantizar a la vendedora First Mortgage Investors el pago de $68,900 que le quedaron a deber, más intereses al 6 1/2 por ciento anual y otros créditos adicionales para el caso de ejecución de la hipoteca. En el párrafo 17 de dicha escritura se insertó la siguiente cláusula sobre aceleración:

---

[1] Véase, Comment, *The Due-On Clause: A Preemption Controversy*, 10 Loyola L.A.L. Rev. 629 (1977), n.1.

[2] Se la describe en la escritura de compraventa como "*a voluntary association with transferable shares of the type commonly called a Massachusetts Business Trust*".

17. Transferencia de Propiedad; Asunción.

Si toda o parte de la Propiedad o un interés en la misma es vendida o transferida por el Deudor sin el consentimiento previo por escrito del Prestador, excluyendo (a) la creación de una carga o gravamen subordinada a esta Hipoteca, (b) la creación de una garantía de precio de compraventa de enseres del hogar, (c) una transferencia por legado o herencia, o (d) la concesión de un derecho de arrendamiento de tres años o menos que no contenga una opción de compra, el Prestador podrá, a opción del Prestador, declarar todas las sumas aseguradas por esta Hipoteca inmediatamente vencidas y pagaderas. El Prestador habrá renunciado a tal derecho de aceleración si, antes de la venta o transferencia, el Prestador y la persona a quien la Propiedad ha de ser vendida o transferida llegan a un acuerdo por escrito a efectos de que el crédito de dicha persona es satisfactorio al Prestador y de que el interés pagadero en relación con las sumas aseguradas por esta Hipoteca será el tipo que requiera el Prestador. La renuncia por el Prestador de la opción de aceleración dispuesta en este párrafo 17 no será interpretada como una renuncia a las obligaciones del Deudor bajo esta Hipoteca y el Pagaré. Si el Prestador ejerce dicha opción de aceleración, el Prestador enviará por correo al Deudor notificación de aceleración de acuerdo con las disposiciones del párrafo 14 de la presente. Dicha notificación concederá un período de no menos de treinta (30) días a partir de envío por correo de la notificación durante el cual el Deudor podrá pagar las sumas declaradas vencidas. Si el Deudor dejare de pagar dichas sumas antes de la expiración de dicho período, el Prestador podrá, sin necesidad de notificación o requerimiento adicional al Presta[tario], invocar cualquiera de los remedios permitidos por el párrafo 18 de la presente.

De estas escrituras se tomó razón en el Registro de la Propiedad.

Posteriormente, mediante escritura pública de 24 de agosto de 1979, los esposos Ortiz Toro vendieron la propiedad a don José Luis Llama Izquierdo por precio de $78,600, pagando el comprador la cantidad de $10,600 y reservándose $68,000 a que estaba reducida la deuda garantizada

por la hipoteca constituida a favor de First Mortgage Investors a que antes nos referimos. El 15 de noviembre de 1979, también mediante escritura pública, el señor Llama Izquierdo vendió la propiedad a don José A. Llama, reconociéndose un pago de $11,600 hecho con anterioridad a la fecha del otorgamiento, como parte del precio y haciendo reserva el comprador de $68,000 para pagar la hipoteca a favor de First Mortgage Investors y $40,000 para satisfacer otra deuda hipotecaria mencionada en la escritura, por lo que el precio de venta ascendió a $119,600.

Ninguna de las ventas en que intervinieron los señores de apellido Llama fue notificada a First Mortgage Investors, ni medió su consentimiento para ellas. First Mortgage se negó a aceptar al nuevo adquirente como su deudor hipotecario y le comunicó al señor Ortiz Toro que había decidido acelerar el vencimiento de la obligación y solicitar la ejecución de la hipoteca a tenor con la cláusula de aceleración de la escritura de hipoteca. Ante tal situación los esposos Ortiz Toro y los señores Llama instaron demanda sobre sentencia declaratoria ante el Tribunal Superior, Sala de Carolina, en la que solicitaron que se declarara nula la referida cláusula de aceleración por ser contraria a la ley, la moral y el orden público por constituir una prohibición de enajenar. Consignaron los plazos rechazados.

El Tribunal Superior resolvió que aquella parte de la cláusula de aceleración que condiciona el consentimiento del prestador para la transferencia de la propiedad a que se acuerde un incremento en el tipo de interés "no responde real y efectivamente a un interés público protegido, sino a un interés comercial privado; no constituye una causa o razón justificada, pues no le da más firmeza a la garantía hipotecaria; es opresiva, injusta e irrazonable; es extorsionante y constituye una penalidad si se transfiere la propiedad sin el consentimiento del prestador y es además contraria al orden público constituyendo en su aplicación una prohibición de enajenar".

■ La parte demandada nos solicita la revisión de la sentencia. Enumera siete planteamientos de Derecho que básicamente se limitan a cuestionar la determinación de que la cláusula constituye una prohibición de enajenar cuando se utiliza para renegociar los intereses. Estando el caso sometido a nuestra consideración se aprobó el 15 de octubre de 1982 la Ley Pública 97–320, del 97mo Congreso de los Estados Unidos, 51 U.S.L.W. 143, conocida por *Garn-St Germain Depository Institutions Act of 1982* que, como veremos, controla la situación y hace innecesario que consideremos los planteamientos de la recurrente.

■ El propósito de estas cláusulas de aceleración ha sido tradicionalmente el de proteger el interés del acreedor de que su garantía no se vea depreciada por pasar a manos de un comprador con credenciales de crédito dudosas o con pobre reputación de conservación y mantenimiènto de la propiedad.[3] Los tribunales han reconocido que los acreedores tienen un interés legítimo en conservar el valor de su garantía, por lo que el uso de las cláusulas de aceleración para conseguir este propósito ha sido ampliamente permitido.[4]

Una segunda función de estas cláusulas de aceleración ha surgido como resultado del rápido aumento en las tasas de interés sobre los préstamos.[5] Esta segunda función es la que permite a los prestamistas mantener su cartera de préstamos devengando el interés prevaleciente en el mercado mediante la oportunidad de renegociar los intereses cuando se vende la propiedad.[6]

Varios estados de los Estados Unidos, algunos mediante

---

[3] Comment, *Due-on-Sale Clause not a Restraint on Alienation of Property*, 59 Wash. Univ. L.Q. 1047 (1981); P. Ashley, *Use of "Due-on" Clauses to Gain Collateral Benefits: A Commonsense Defense*, 10 Tulsa L.J. 590 (1975).

[4] *Due-on-Sale Clause*, supra; Ashley, *op. cit.*

[5] L. Kreicher, *Much Ado About Due-on-Sale: Avoiding the Tempest in New York*, 10 Hofstra L. Rev. 1229 (1982).

[6] Kreicher, *op. cit.*

legislación y otros mediante decisiones judiciales, han prohibido la ejecución de la cláusula de aceleración cuando se utiliza para fines de renegociar un aumento en los intereses. Ello inquietó al Congreso de los Estados Unidos, ya que se estaba creando confusión en torno a la obligatoriedad de la cláusula. En consecuencia se presentó en el Senado el Proyecto S. 2879, que se convirtió en la citada Ley Pública 97–320, aprobada previo informe favorable del Comité sobre Banca, Vivienda y Asuntos Urbanos,(7) que determinó, entre otras cosas, que tales prohibiciones por parte de algunos estados estaban afectando el mercado secundario de hipotecas, que es el que suple la mayor parte de los fondos para las hipotecas, y que la decisión del Tribunal Supremo federal en *Fidelity Federal Sav. & Loan Assn.* v. *De La Cuesta*, 458 U.S. 141 (1982), que sostuvo el derecho de las asociaciones de ahorro y préstamo federales a hacer cumplir la cláusula, ponía en desventaja a las instituciones prestatarias estatales y a otros prestamistas.(8)

■ Adoptado el referido proyecto y aprobado como la Ley Pública 97–320 el 15 de octubre de 1982, su Título III, Parte C, expresamente ocupa el campo y permite a los prestamistas incluir la cláusula *due-on-sale* en contratos de préstamos garantizados con hipoteca sobre bienes inmuebles, y prohíbe a los estados que impidan o limiten la ejecución de las cláusulas *due-on-sale*. La ley tiene vigencia inmediata y aplica a todos los préstamos hipotecarios de instituciones estatales o federales,(9) excepto aquellos que se hicieron o se asumieron durante un período de excepción que establece la ley.(10) Esta excepción fue creada para

---

(7) *Committee on Banking, Housing and Urban Affairs.*

(8) Véase, *Senate Report* No. 97-536, *Depository Institutions Amendments of 1982: Senate Comm. on Banking, Housing, and Urban Affairs*, 97th Cong., 2d Sess. Sept. 3, 1982.

(9) La ley no aplica a préstamos originados por asociaciones de ahorro y préstamo federales y por bancos de ahorro federales (*Federal Savings Bank*), Título III, Parte C, Sec. 341, subsección (c) de la Ley.

(10) Título III, Parte C, Sec. 341, subsección (c).

evitar que la ley tuviera un impacto injusto en aquellos compradores que, a pesar de que su contrato contenía la cláusula de aceleración, confiaron en que no se haría cumplir debido a prohibiciones estatales, ya fueran leyes, disposiciones constitucionales o decisiones judiciales del tribunal de más alta jerarquía en el estado. Este "período de excepción", que el mencionado Comité denomina *window period*, comprende desde la fecha en que el estado adoptó la prohibición, fuere mediante disposición constitucional, estatuto, o pronunciamiento judicial por su más alto tribunal, hasta la fecha de vigencia de la ley del Congreso.

Los préstamos hipotecarios originados o asumidos durante este llamado *window period*, fueran hechos por instituciones estatales o federales, estarán sujetos a la aplicación del derecho estatal por tres años a partir de la fecha de aprobación de la citada ley congresional.[11]

La mencionada Ley Pública 97–320 es, por sus disposiciones expresas, aplicable a Puerto Rico.[12] Y en el momento en que se aprobó, 15 de octubre de 1982, que es la fecha de su vigencia, no existía en esta jurisdicción disposición constitucional, ni estatuto, ni decisión nuestra que prohibiera la ejecución de las cláusulas de aceleración o *due-on-sale*. Por tanto, no pueden cobijarse los demandantes y aquí recurridos bajo la excepción o *window period* que dispuso la citada ley congresional.[13]

Por los fundamentos expresados *se revocará la sentencia recurrida, se declarará sin lugar la demanda sobre senten-*

---

[11] Durante este período de tres años los estados podrán variar el efecto de las prohibiciones estatales sobre la cláusula *due-on-sale* con relación a los préstamos cubiertos por el *window period* que hayan sido originados en instituciones estatales. En estos casos podrían eliminar la prohibición o alargar su duración. Sin embargo, no podrán aplicar la prohibición a préstamos que queden fuera del *window period*. Los préstamos hechos por instituciones federales que estén dentro del *window period* sólo estarán sujetos a la reglamentación estatal por un período de tres años y luego sus cláusulas de aceleración serán ejecutables.

[12] Título III, Parte C, Sec. 341, subsección (a)(5).

[13] Se une, como apéndice a esta opinión, una transcripción literal de la Parte C del Título III de la citada Ley Pública 97–320.

*cia declaratoria, y se devolverá el caso al tribunal de instancia para ulteriores procedimientos compatibles con lo expresado en esta opinión.*

El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Rebollo López no intervino.

## APÉNDICE

### Part C—Preemption of Due on Sale Prohibitions
#### DUE-ON-SALE CLAUSES

Sec. 341.(a) For the purpose of this section—

(1) the term "due-on-sale clause" means a contract provision which authorizes a lender, at its option, to declare due and payable sums secured by the lender's security instrument if all or any part of the property, or an interest therein, securing the real property loan is sold or transferred without the lender's prior written consent;

(2) the term "lender" means a person or government agency making a real property loan or any assignee or transferee, in whole or in part, of such a person or agency;

(3) the term "real property loan" means a loan, mortgage, advance, or credit sale secured by a lien on real property, the stock allocated to a dwelling unit in a cooperative housing corporation, or a residential manufactured home, whether real or personal property; and

(4) the term "residential manufactured home" means a manufactured home as defined in section 603(6) of the National Manufactured Home Construction and Safety Standards Act of 1974 which is used as a residence; and

(5) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, American Samoa and the Trust Territory of the Pacific Islands.

(b)(1) Notwithstanding any provision of the constitution or laws (including the judicial decisions) of any State to the contrary, a lender may, subject to subsection (c), enter into or enforce a contract containing a due-on-sale clause with respect to a real property loan.

(2) Except as otherwise provided in subsection (d), the exercise by the lender of its option pursuant to such a clause shall be exclusively governed by the terms of the loan contract, and all rights and remedies of the lender and the borrower shall be fixed and governed by the contract.

(3) In the exercise of its option under a due-on-sale clause, a lender is encouraged to permit an assumption of a real property loan at the existing contract rate or at a rate which is at or below the average between the contract and market rates, and nothing in this section shall be interpreted to prohibit any such assumption.

(c)(1) In the case of a contract involving a real property loan which was made or assumed, including a transfer of the liened property subject to the real property loan, during the period beginning on the date a State adopted a constitutional provision or statute prohibiting the exercise of due-on-sale clauses, or the date on which the highest court of such State has rendered a decision (or if the highest court has not so decided, the date on which the next highest appellate court has rendered a decision resulting in a final judgment if such decision applies State-wide) prohibiting such exercise, and ending on the date of enactment of this section, the provisions of subsection (b) shall apply only in the case of a transfer which occurs on or after the expiration of 3 years after the date of enactment of this Act, except that—

(A) a State, by a State law enacted by the State legislature prior to the close of such 3-year period, with respect to real property loans originated in the State by lenders other than national banks, Federal savings and loan associations, Federal savings banks, and Federal

credit unions, may otherwise regulate such contracts, in which case subsection (b) shall apply only if such State law so provides; and

(B) the Comptroller of the Currency with respect to real property loans originated by national banks or the National Credit Union Administration Board with respect to real property loans originated by Federal credit unions may, by regulation prescribed prior to the close of such period, otherwise regulate such contracts, in which case subsection (b) shall apply only if such regulation so provides.

(2)(A) For any contract to which subsection (b) does not apply pursuant to this subsection, a lender may require any successor or transferee of the borrower to meet customary credit standards applied to loans secured by similar property, and the lender may declare the loan due and payable pursuant to the terms of the contract upon transfer to any successor or transferee of the borrower who fails to meet such customary credit standards.

(B) A lender may not exercise its option pursuant to a due-on-sale clause in the case of a transfer of a real property loan which is subject to this subsection where the transfer occurred prior to the date of enactment of this Act.

(C) This subsection does not apply to a loan which was originated by a Federal savings and loan association or Federal savings bank.

(d) A lender may not exercise its option pursuant to a due-on-sale clause upon—

(1) the creation of a lien or other encumbrance subordinate to the lender's security instrument which does not relate to a transfer of rights of occupancy in the property;

(2) the creation of a purchase money security interest for household appliances;

(3) a transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;

(4) the granting of a leasehold interest of three years or less not containing an option to purchase;

(5) a transfer to a relative resulting from the death of a borrower;

(6) a transfer where the spouse or children of the borrower become an owner of the property;

(7) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property;

(8) a transfer into an inter vivos trust in which the borrower is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the property; or

(9) any other transfer or disposition described in regulations prescribed by the Federal Home Loan Bank Board.

(e)(1) The Federal Home Loan Bank Board, in consultation with the Comptroller of the Currency and the National Credit Union Administration Board, is authorized to issue rules and regulations and to publish interpretations governing the implementation of this section.

(2) Notwithstanding the provisions of subsection (d), the rules and regulations prescribed under this section may permit a lender to exercise its option pursuant to a due-on-sale clause with respect to a real property loan and any related agreement pursuant to which a borrower obtains the right to receive future income.

(f) The Federal Home Loan Mortgage Corporation (hereinafter referred to as the "Corporation") shall not, prior to July 1, 1983, implement the change in its policy announced on July 2, 1982, with respect to enforcement of due-on-sale clauses in real property loans which are owned in whole or in part by the Corporation.

(g) Federal Home Loan Bank Board regulations restrict-

ing the use of a balloon payment shall not apply to a loan, mortgage, advance, or credit sale to which this section applies.