# State Regulation of an Insurance Program Conducted by the Export-Import Bank of the United States

Entities who participate as intermediaries with small businesses in an insurance program operated by the Export-Import Bank are subject to non-discriminatory state regulation of their activities.

March 19, 1986

MEMORANDUM OPINION FOR THE GENERAL COUNSEL,
EXPORT-IMPORT BANK OF THE UNITED STATES

This memorandum responds to your request for the Department of Justice's opinion whether the states may regulate or tax certain entities involved in an insurance program developed by the Export-Import Bank of the United States (Eximbank) for small business.[1] Your request is limited to the single issue of whether the states may regulate the "Administrators" who participated in the program and act as agents for the small businesses purchasing the insurance developed by Eximbank. We conclude that the Administrators are subject to nondiscriminatory state regulation.

## I. Background

Eximbank is a wholly owned government corporation and an agency of the United States. 12 U.S.C. § 635(a)(1). Congress originally established it to facilitate the exchange of commodities between the United States and other countries. In 1953, for the first time, Eximbank was granted, in addition to the power to make loans and guarantees, the power to provide insurance against risks of loss associated with commercial exportation of goods. Pub. L. No. 83–30, 67 Stat. 28 (1953). Current law authorizes Eximbank to "guarantee, insure, coinsure, and reinsure against political and credit risks of loss." 12 U.S.C. § 635(a)(1).

Eximbank also is authorized to employ "exporters, insurance companies, financial institutions, or others or groups thereof" to act as its agents in the issuance and servicing of insurance. *Id.* 635(c)(2). The Foreign Credit Insur-

---

[1] The entities involved in the program are: (1) Eximbank itself; (2) the Foreign Credit Insurance Association, an association of private insurers that acts as Eximbank's agent in providing insurance; and (3) various "Administrators" who act as agents for the small businesses who purchase the insurance developed by Eximbank.

27

ance Association (FCIA) is an association composed of private commercial insurance carriers created in 1961 to act with Eximbank in providing protection against certain of the commercial and political risks faced by American exporters when they sell to foreign customers on credit terms. The FCIA is the agent of Eximbank in selling such insurance.

The final significant participants in Eximbank insurance activities are known as "Administrators." Your office has described the role of the Administrators as follows:

> In response to a Congressional mandate for Eximbank to encourage the participation of small business in international trade, Eximbank has developed a new insurance policy, the Export Credit Insurance Umbrella Policy (the "Umbrella Policy"). . . . The Umbrella Policy was devised to improve distribution of, and simplify the paperwork associated with, our export credit insurance by using certain entities, which have frequent contact with small businesses, as intermediaries (the "Administrators"). Eximbank is the only insurer on the Umbrella Policy, and FCIA acts as Eximbank's agent. A number of exporters can be insured under one policy and have the policy paperwork handled by an Administrator who is free to charge the insured exporters a fee for its services.

The Administrators are thus essentially insurance brokers for the small businesses who wish to purchase insurance from Eximbank through the FCIA.

## II. Analysis

Federal instrumentalities are immune from state regulation, in the absence of "clear and unambiguous" congressional authorization. *Hancock* v. *Train*, 426 U.S. 105, 179 (1976). It is well settled, however, that independent federal contractors are not federal instrumentalities and therefore may be subject to state regulation even if such regulation increases the burden on the federal government. *See Penn Dairies, Inc.* v. *Pennsylvania Milk Control Comm'n*, 318 U.S. 261, 269 (1943) ("those who contract to furnish supplies or render services to the government are not [federal] agencies and do not perform governmental functions"). We understand that the Administrators are not even agents of federal government, but instead are agents of the small business exporters for whom they obtain Eximbank's umbrella insurance and do the policy paperwork and from whom they receive a fee for their services. Therefore, it is clear that the Administrators are not immune from state regulation on the grounds that they constitute federal instrumentalities.

The remaining basis for exempting the Administrators from state regulation is federal preemption. A state law will be deemed preempted by federal law either if it conflicts with federal law, or if the federal law suggests that Congress intended its own law to occupy the field fully, irrespective of the

substance of the state law. *Florida Avocado Growers* v. *Paul*, 373 U.S. 132, 141 (1963). We understand that state laws that restrict certain institutions such as state banks from acting as insurance brokers limit the potential class of Administrators, thus possibly inhibiting the distribution of insurance in the small business community.[2] We are also informed that some states impose licensing requirements on corporations engaged in insurance activities such as those undertaken by the Administrators, and thereby subject such corporations to regulation. The overall effect of these state laws may be to discourage some institutions, particularly banks, from becoming Administrators.[3]

The touchstone of a preemption claim is the intent of Congress. *See, e.g., Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978). Preemption analysis, however, begins with certain presumptions, because congressional intent with respect to displacing state regulations is often unclear. When Congress legislates "in a field which the states have traditionally . . . occupied we start with the assumption that the historic police powers of the States [are] not to be ousted by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The regulation of insurance is a field traditionally occupied by the states and therefore it cannot lightly be inferred that Congress intended to legislate in derogation of state regulation of corporations operating in this area.[4]

After a survey of the statute and the legislative history we are unable to locate any statutory provision that conflicts with state insurance law or any congressional intent to abrogate state licensing and regulatory schemes. To be sure, the November 30, 1983 Amendments to the Export-Import Bank Act, Pub. L. No. 98– 181, 97 Stat. 1254, evince an intent to increase Eximbank aid to small business. In the 1983 Amendments Congress stated:

> (i) (I) It is further the policy of the United States to encourage the participation of small business in international commerce.
> (II) In exercising its authority, the Bank shall develop a program which gives fair consideration to making loans and providing guarantees for the export of goods and services by small businesses.
> (ii) It is further the policy of the United States that the Bank shall give due recognition to the policy stated in § 631(a) of Title 15 that "the Government should

---

[2] *See, e.g.*, Conn. Gen. Stat. § 38–72(a).

[3] *See generally* Wisc. Gen Stat. § 618.

[4] Indeed, Congress has recognized the importance of local regulation of insurance in the McCarran-Ferguson Act, which provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such businesses." 15 U.S.C § 1012(a). A subsequent provision of the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance, unless such Act specifically relates to the business of insurance " *Id* § 1012(b). Because we conclude that state regulation of the Administrators is not prohibited under general principles of preemption, we do not have to decide whether the McCarran-Ferguson Act would preclude preemption in any event.

> aid, counsel, assist, and protect insofar as is possible, the interests of small business concerns in order to preserve free competitive enterprise."

12 U.S.C. § 635(b)(1)(E).[5] The Amendments also provide that one of the members of Eximbank's board of directors is to "be selected from among the small business community . . . and represent the interests of small business." *Id.* § 635(b)(1)(E)(v). Finally, the Amendments direct Eximbank to render reports on the allocation of sums set aside for small business. *Id.* § 635g(c). Notably lacking in the Amendments or their legislative history is any language which suggests that insurance brokers for exporters connected with an Eximbank program are relieved of the obligation to comply with state insurance requirements. Nor is there any suggestion that state insurance laws have proved an obstacle to the sale of Eximbank's insurance to small business.[6]

Acknowledging that there is no direct conflict between state and federal law, Eximbank argues that state insurance regulation and licensing is preempted because by inhibiting certain kinds of corporations from becoming Administrators such laws impose burdens on the means Eximbank has chosen to meet the congressional goal of developing export insurance for small business. However, courts have uniformly refused to displace state regulations applicable to federal contractors even if such regulations impose incidental burdens on the means of fulfilling a congressional mandate. *See, e.g., Penn Dairies* v. *Milk Control Comm'n,* 318 U.S. 261, 271 (1943) (state can refuse to renew the license of a milk dealer who sold milk below the state minimum price to United States despite impact in United States' procurement policy; "state regulations are to be regarded as the normal incidents within the same territory of a dual system of government"); *James Stewart & Co.* v. *Sadrakula,* 300 U.S. 94 (1939) (sanctioning state's imposition of safety requirements upon a contractor constructing a federal building in the face of arguments that such regulations would raise the cost to the government); *O'Reilly* v. *Board of Medical Examiners,* 426 P.2d 167 (Cal. 1967) (Traynor, C.J.) (refusing to infer federal preemption of state licensing rules for doctors even in light of burdens such licensing imposed on foreign medical exchange program authorized by Congress); *United States* v. *Town of Windsor,* 496 F. Supp. 581, 591 (D. Conn. 1980) (upholding

---

[5] In order to assure that the policy of aiding small business is carried out, Eximbank is directed to: promote small business export financing programs in cooperation with the Secretary of Commerce, the Office of International Trade of Small Business Administration, and the private sector, particularly small business organizations, state agencies, chambers of commerce, banking organizations, export management companies, export trading companies, and private industry.
12 U.S.C. § 635(b)(1)(E)(viii).

[6] In a hearing before a subcommittee of the Senate Committee on Small Business, the Chairman of Eximbank described the proposed "umbrella" insurance program for small businesses but nowhere suggested that this program would require the abrogation of state insurance regulation or licensing schemes. To the contrary, one of the themes of the Chairman's testimony was that he had cooperated with state agencies in the past and expected to continue to work closely with them in the future. *Financing of Small Business Exports by The Export-Import Bank: Hearing before the Subcomm. on Export Promotion and Market Development of the Senate Comm. on Small Business,* 98th Cong., 1st Sess. 8–9 (1983) ("We have met several times with representatives of state governments and we will continue to work closely with them as the campaign develops.").

30

state's right to require building permit of contractor who was building gasifica-tion plant pursuant to congressional mandate to develop a more efficient means of utilizing coal). An essential rationale underlying these cases is that state regulation of private contractors, unlike state regulation of federal instrumen-talities or federal officials, cannot be viewed as superfluous, because the federal ties government does not directly supervise private contractors even when they ties act as its agents. This rationale applies *a fortiori* to the Adminis-trators who are not even agents of the federal government and are not subject to any federal supervision.

Therefore, we conclude that in the absence of some contrary indication of congressional intent states are not preempted from regulating private entities even if such regulations impose some burdens on their participation in a federal program.[7] When Congress establishes an objective for a federal agency, it is to be presumed that it wishes the agency to pursue the objective against the background of ordinary state regulation of private entities because such regula-tion has legitimate objectives of its own. Any other conclusion would curtail the ability of the states to protect the welfare of their citizens: federal agencies possessed of some statutory mandate would acquire the authority to grant immunity from state regulation to private entities simply on the grounds that such immunity would lead to the more efficient fulfillment of their mandate.[8]

## Conclusion

On the basis of the analysis set forth above, we have concluded that the Administrators are subject to non-discriminatory state regulation.

DOUGLAS W. KMIEC
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[7] *Fidelity Federal Savings & Loan Ass'n* v. *De La Cuesta*, 458 U.S. 141 (1982), a case principally relied on by Eximbank to support its argument that the 1983 Export-Import Bank Amendments preempt state insurance licensing requirements does not change the foregoing analysis. In *Fidelity*, the Federal Home Loan Bank Board had issued a regulation providing that a federal savings and loan association continued to have the power to include a due-on-sale provision in its loan agreements. *Id.* at 146–47. The preamble to the regulation also stated that the banks would not be subject to any conflicting state law with respect to due-on-sale provisions. *Id.* at 147. The Court held that the Board's due-on-sale regulations preempted conflicting state limitations on the due-on-sale provisions of a federal savings bank. *Id.* at 155. *Fidelity* thus simply represents an instance of federal preemption arising from an express conflict between state and federal laws. It stands for the proposition that a duly promulgated and authorized regulation of an agency has the same power to preempt contrary state law as a statute passed by the Congress. *Fidelity* does not support the argument for the preemption of state insurance regulation because neither any provision of the statute under which Eximbank operates nor any regulation issued by Eximbank conflicts with state law.

[8] Our opinion that the Administrators would ordinarily be subject to State regulation is not inconsistent with the arguments advanced in *Squire, Inc.* v. *Export-Import Bank of the United States*, No. 84–0234 (S.D. Cal. 1985), that Eximbank and the FCIA should not be subject to punitive damages. First, the argument in *Squire* is not based on a claim that the federal statute preempts all state regulation, but rather that in litigation arising out of nationwide programs in the paramount federal interest compels the application of federal law to questions of *liability* in governmental programs and transactions. *See United States* v *Little Lake Misere Land Co.*, 412 U.S. 580, 592–94 (1974); *Clearfield Trust Co.* v. *United States*, 318 U.S. 363 (1943). Second, this memorandum does not address whether Eximbank or the FCIA may be immune from state regulations on the ground that they are federal instrumentalities.

31