

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

December 21, 1990

Honorable Bruce Gibson
Chairman
House Government Organi-
  zation Committee
P.O. Box 2910
Austin, Texas   78768-2910

Opinion No.  JM-1269

Re:    Whether the homestead
provision of the Texas Consti-
tution has been preempted by
federal legislation regulating
savings and loan associations
and other lending institutions
(RQ-2066)

Dear Representative Gibson:

    You ask whether federal law and regulations have
preempted the Texas homestead provisions, in particular,
article XVI, section 50, of the Texas Constitution, which
provides in part:

> The homestead of a family, or of a single
> adult person, shall be, and is hereby pro-
> tected from forced sale, for the payment of
> all debts except for the purchase money
> thereof, or a part of such purchase money,
> the taxes due thereon, or for work and
> material used in constructing improvements
> thereon . . . . <u>No mortgage, trust deed, or
> other lien on the homestead shall ever be
> valid, except for the purchase money there-
> for, or improvements made thereon, as
> hereinbefore provided</u> . . . . All pretended
> sales of the homestead involving any condi-
> tion of defeasance shall be void.

Tex. Const. art. XVI, § 50 (emphasis added).[1]  This provi-
sion prevents the owners of homestead property from

---

    1.  The Texas homestead exemption first appeared in the
statutes of the Republic of Texas and was placed in the
constitution when Texas became a state in 1845.  It has been
included in every Texas Constitution since that time.  <u>See</u> 2
G. Braden, <u>The Constitution of Texas: An Annotated and
Comparative Analysis</u> at 788 (1977).

borrowing money secured by the equity in the homestead for any purpose other than the expressly authorized purposes.

Your inquiry was prompted by a 1989 opinion letter written by the deputy general counsel of the Federal Home Loan Bank Board [hereinafter Bank Board], which regulated federally chartered savings and loan associations under the Home Owners' Loan Act of 1933 [HOLA], 12 U.S.C. § 1464. The letter from the Bank Board responded to questions asked by the United States Department of Housing and Urban Development.[2]

The Bank Board's letter concluded that HOLA and regulations issued thereunder permit national savings and loan associations to issue "line of credit home equity conversion mortgages," or "reverse mortgages," which would allow the homeowner to borrow money on the security of his equity in his residence. The deputy general counsel expressed the opinion that the federal statute and regulations would preempt the Texas homestead provisions with respect to such mortgages issued by federally-chartered savings and loan associations. The Department of Housing and Urban Development also inquired whether the federal Alternative Mortgage Transaction Parity Act of 1982 [hereinafter Parity Act], 12 U.S.C. §§ 3801-3806, would authorize state associations to make "reverse mortgages" on an equal basis with national savings and loans associations, with the result that the Texas homestead provisions would be preempted as to mortgages issued by state-chartered associations. The Bank Board letter declined to express an opinion about state-chartered associations because they were not under its supervision.

You ask this office to review the reasoning of the deputy general counsel's opinion letter and to answer the question he left unanswered. Your inquiry raises the following issues:

> Is a federally-chartered lender permitted by federal law and regulations to make home equity loans?

---

2. Letter from Jack D. Smith, Deputy General Counsel, Federal Home Loan Bank Board to John A. Maxim, Jr., Associate General Counsel, U.S. Department of Housing and Urban Development (Aug. 4, 1989). The Federal Home Loan Bank Board was replaced with the Office of Thrift Supervision in late 1989. See infra note 5 at 10.

> If so, does the federal authority preempt the
> Texas homestead exemption law, insofar as the
> federally-chartered lender is concerned?

> If a federally-chartered lender has authority
> to make home equity loans, do state-chartered
> lenders have similar authority to make home
> equity loans under the Parity Act, adopted as
> title VIII of the Garn-St Germain Depository
> Institutions Act of 1982, Pub. L. No. 97-320?

With respect to the first issue, we will not undertake to reanalyze the federal laws and regulations relied on in the Bank Board's opinion letter; instead, we will set out the letter's reasoning as a basis for reaching the next question. Any questions we have about the reasoning of the Bank Board's letter can be raised in our discussion of the preemption question.

According to the opinion letter of the Bank Board, the authority of federally-chartered savings and loan associations to make loans on the security of a home owner's equity in his residence, including "reverse mortgages," is based on the following provision of HOLA:

> An association may to such extent, and
> subject to such rules and regulations as the
> Board may prescribe from time to time,
> invest in, sell, or otherwise deal with the
> following loans, or other investments:

> . . . .

> (1)(B) Real property loans

> Loans on the security of liens upon
> residential or nonresidential real property.

12 U.S.C. § 1464(c)(1)(B) (superseded).[3] The agency's rule-making power is set out in the following provision:

---

3. This provision now reads as follows:

To the extent specified in regulations of the Director [of the Office of Thrift Management], a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments:

(Footnote Continued)

>    In order  to provide  thrift  institutions
> for the  the deposit  of  funds and  for  the
> extension of credit for homes and other goods
> and services, the Director [of the Office  of
> Thrift Management] is authorized, under  such
> regulations as the Director may prescribe --
>
>    (1)   to  provide  for  the  organization,
>    incorporation, examination, operation, and
>    regulation of associations to be known  as
>    Federal  savings  associations  (including
>    Federal savings banks), and
>
>    (2)   to issue charters therefore,
>
> giving  primary  consideration  of  the  best
> practices  of  thrift  institutions  in   the
> United States.   The lending  and  investment
> powers conferred by this section are intended
> to encourage  such  institutions  to  provide
> credit for housing safely and soundly.

12 U.S.C. § 1464(a).

The letter from the  Bank Board provides the  following discussion of the regulations promulgated to implement  this provision:

>    The history of  12 C.F.R.  pt. 545,  which
> governs the  operations of  Federal  associa-
> tions, is crucial to this analysis.  Prior to
> the Garn-St Germain Act, Federal associations
> were specifically authorized by 12 C.F.R.  §§
> 545.6-2(a)(7) and 545.6-4(d) (1981) to  offer
> reverse mortgages to homeowners.
>
>    After the Garn-St Germain Act was enacted,
> the Board substantially revised 12 C.F.R. pt.
> 545.  Explicit  provisions governing  reverse
> mortgages were removed  from the  regulation,

---

(Footnote Continued)

(1)  . . .

(B)  Residential real property loans

     Loans on the security of liens upon
     residential real property.

and 12 C.F.R. § 545.1 (1988), which reads as follows, was added:

> A Federal association may exercise all authority granted it by the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended . . . whether or not implemented specifically by Bank Board regulation, subject to the limitations and interpretations contained in this part.

Thus, the letter concludes that the regulation authorizes the federally-chartered associations to exercise powers that are not specifically set out by regulations, including powers that are inconsistent with state law.

The letter quotes the preamble to 12 C.F.R. § 545.1 on the Bank Board's approach to exercise of its regulatory power:

> Current Part 545 is based upon the premise that the investment authority of the HOLA must be implemented expressly by regulation . . . . In order to grant associations the maximum flexibility to exercise the authorities granted by the HOLA, the Board has determined to revise the general approach to regulating investment activities of Federal associations. Accordingly, Part 545 now addresses the authority of associations only to limit, interpret or recognize incidental authority. Federal associations may exercise all authority granted by the HOLA subject only to limitations contained in the regulations. Because this approach differs from the current treatment, these amendments to Part 545 include a section specifically stating that Federal associations may exercise all statutory authority subject to the limitations in this Part. The Board emphasizes that deletion of sections specifically implementing existing authority does not mean that any authority can no longer be exercised.

Bank Board letter of August 4, 1989 (quoting 48 Fed. Reg. 23032 (May 23, 1983)).

The opinion letter states that federally-chartered associations may offer reverse mortgages to homeowners. It goes on to express the opinion that Texas homestead laws have been preempted with respect to federal institutions,

relying on <u>Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141 (1982) and the provisions of HOLA:

> Congress by statute has explicitly permitted Federal associations to secure loans with real estate. 12 U.S.C. § 1464(c)(1)(B).  It is axiomatic that the authority to secure loans protects lenders in the event of default on such loans by foreclosing on the property constituting the security.  State laws which prevent or otherwise restrict Federal associations from engaging in transactions involving such mortgages, are in conflict with Bank Board regulations.
>
> The Texas laws in question clearly prevent Federal associations from exercising the authority granted to them by the HOLA and the Board's regulations.  Therefore, this Office concludes that the constitution and statutes of Texas under review are 'an obstacle to the accomplishment and execution of the purposes and objectives' of 12 C.F.R. pt. 545 to the extent that they prevent Federal associations from securing line of credit conversion mortgages with real estate consisting of homesteads, and foreclosing on such mortgages in the event of default.  According to <u>de la Cuesta</u>, the HOLA authorizes the Board to enact regulations that preempt substantive state real property laws purporting to govern the mortgage lending operations of Federal associations.  The regulatory history of 12 C.F.R. § 545 reveals that the Board exercised this authority to preempt state real property laws, insofar as reverse mortgages are concerned.

The "doctrine of preemption" is rooted in the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, cl. 2; <u>Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta</u>, 458 U.S. 141, 152 (1982). The Supremacy Clause requires inconsistent state laws to yield to valid federal laws and regulations.  <u>Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, supra</u>; <u>Seiter v. Veytia</u>, 756 S.W.2d 303 (Tex. 1988).

The <u>de la Cuesta</u> case arose out of a conflict between a regulation of the Federal Home Loan Bank Board on

"due-on-sale" clauses[4]  in mortgages  and California  common law.  The federal regulation authorized federal savings  and loan associations to include  a "due-on-sale" clause in  the loan  document,  while  the  California  Supreme  Court  had declared that  such clauses  could be  exercised only  under limited circumstances.   The  United  States  Supreme  Court found that the  California rule created  an obstacle to  the accomplishment  and  execution  of  the  full  purposes  and objectives of the due-on-sale regulation.   458 U.S. at   156. It also  found that  the Bank  Board expressly  intended  to preempt contrary state  laws and  that it  acted within  its authority in  issuing the  preemptive regulation,  reviewing the language and  legislative history of  the HOLA to  reach the latter conclusion.

We are not  persuaded that  the _de la   Cuesta_ case  resolves the question before us.   That case involved a  board rule specifically  authorizing the  federal associations  to include a "due-on-sale"  clause in loan  documents.  It  did not address the current  system of regulation, which  allows federal associations  to  exercise all  statutory  authority subject only to express  limitations.  Moreover, the  Financial Institutions Reform, Recovery,  and Enforcement Act  of 1989, P.L. 101-73,  adopted amendments to  HOLA directed  at providing closer supervision of federal thrift institutions. 1989 U.S. Code Cong. & Admin. News 432 (House Conf. Rep. No. 101-222, 101 Cong. 1st  Sess.).  Thus, the relevant  federal provisions  differ in some ways from those at issue in _de la Cuesta_.  Expressions of  congressional intent in  connection with the 1989 amendments may also be relevant to the preemption question.

The 1982 case dealt with  the timing of repayment of  a loan secured by  real property.  The  Texas homestead  laws, however, forbid the use of equity in a homestead to securing loans for any  purpose not authorized  by the  constitution. We are faced with a question of whether the transaction  may be made at  all, not  merely a question  of the  terms of  a transaction.  Thus, preemption  of the Texas  constitutional protection for the homestead raises a different, and  possibly more difficult, question than the one addressed in _de la Cuesta_.

_____

4.  A due-on-sale clause allows  the lender to  declare the balance on a mortgage  loan immediately due and  payable when the property  is sold.   If the  lender exercises  this option, the purchaser cannot assume the loan.

Supreme Court decisions on preemption questions decided subsequent to _de la Cuesta_ must also be considered. In _California v. ARC America Corp._, 109 S.Ct. 1661 (1989), the Court reiterated the presumption against finding preemption of state law in areas traditionally regulated by the states:

> When Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'

109 S.Ct. at 1665.

In _Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp._, 109 S.Ct. 1361 (1989), the Bank Board claimed that HOLA and the enabling legislation of the Federal Savings and Loan Insurance Corporation (FSLIC) preempted Texas law on the adjudication of claims against federal associations and conferred this power on the FSLIC. The Supreme Court interpreted provisions governing the FSLIC and the Bank Board, adopted over a span of fifty years, to determine the Congressional intent underlying the specific provision in question. It concluded that Congress did not intend to authorize the FSLIC to adjudicate claims and that state law was not preempted.

Finally, preemption cases can be difficult to reconcile. Levy, Karst, Mahoney, _Encyclopedia of the American Constitution_ at 1438. Preemption questions arise because Congress has ignored the existence of related state laws and the court must deal with the factors that would have confronted the legislature had it thought about related state laws. The judges' views as to the wisdom of the federal and state laws are among the factors that may in fact be decisive in a preemption question. _Id._

In answer to your second question, neither the deputy general counsel's opinion letter nor the authorities he cites convince us that the Texas homestead provisions are preempted as to federally-chartered associations by regulations issued under HOLA. Because this question ultimately cannot be resolved solely by analyzing statutes and judicial decisions, it cannot be resolved in an advisory opinion. It is a question for judicial resolution in an adversary proceeding, in which the relevant state and federal policies can be thoroughly briefed and argued. We cannot advise you that the courts would follow the approach taken by the opinion letter written by the deputy general counsel of the Bank Board.

We can, however, advise you as to the intended   effect of the Parity Act, about which you inquire  in your  third question.  Even if regulations  issued under HOLA  preempted the Texas homestead provisions  with respect to home  equity loans made by federally-chartered savings and loan  associations, the Parity Act would not give state-chartered associations similar  authority to  make  such loans.  A  careful reading of the Parity Act shows that it deals with  interest rates and repayment  terms of mortgage  loans, and does  not relate to the use of the  equity in a homestead as  security for a loan.

The Parity Act, 12 U.S.C. §§ 3801-3806, was enacted  as title VIII of the  Garn-St. Germain Depository  Institutions Act of 1982.  It was  adopted to give state-chartered  mortgage lenders  parity with  federally-chartered lenders  with respect to "alternative  mortgage loans."  See  12 U.S.C.  § 3801.  It allows  state-chartered mortgage  lenders to  make such transactions to the extent that they are authorized for federally-chartered institutions by valid regulation of  the appropriate federal agency; that is, the Comptroller of  the Currency for  national  banks,  the  National  Credit  Union Administration Board  for  federal credit  unions,  and  the Director of the Office  of Thrift Supervision (formerly  the Federal  Home  Loan  Bank  Board)  for  federally-chartered savings and loan  associations.  12 U.S.C.  § 3803(a).   The Parity Act thus  makes applicable to  state lenders  certain valid regulations  issued  under  other  law  by  a  federal regulatory agency.  Id.  It  expressly  preempts  contrary provisions in  state  constitutions, laws,  or  regulations, except for  states  that  opted out  of  its  provisions  by October 15, 1985.  12 U.C.S. §§ 3803(c), 3804.

The Congressional purpose in adopting the Parity Act is stated in  section 3801  of title  12 of  the United  States Code, which provides as follows:

> (a) The Congress hereby finds that --
>
> > (1)   increasingly volatile and dynamic changes   in   interest   rates   have seriously  impaired   the  ability   of housing creditors to provide  consumers with  fixed-term,   fixed-rate   credit secured by interests in real  property, cooperative   housing,   manufactured homes, and other dwellings;
> >
> > (2)   alternative mortgage transactions are essential  to the  provision of  an adequate supply  of credit  secured  by residential property necessary to  meet the demand expected during the  1980's; and

(3) the Comptroller of the Currency, the National Credit Union Administration, and the Director of the Office of Thrift Supervision have recognized the importance of alternative mortgage transactions and have adopted regulations authorizing federally chartered depository institutions to engage in alternative mortgage financing.

(b) It is the purpose of this chapter to eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions <u>so long as the transactions are in conformity with the regulations issued by the Federal agencies</u>. (Emphasis added.)

As subsection (b) of section 3801 indicates,[5] federally-chartered depository institutions were already authorized by agency regulations to engage in such "alternative mortgage transactions" before the Parity Act was adopted. The purpose of the Parity Act was to enable state-chartered institutions to engage in such transactions on an equal basis with the national institutions. The Parity Act can effect a preemption of a Texas constitutional provision only if regulations issued under other federal law authorizing federally-chartered institutions to engage in alternative mortgage transactions preempt the Texas provision. <u>See</u> 12 U.S.C. § 3803(a)(3). To determine whether state-chartered lenders have authority pursuant to the Parity Act to make loans secured by a home owner's equity,

---

5. Section 3801, indicating the intent of Congress, has not been amended since its enactment in 1982, except for the substitution in 1989 of "the Director of the Office of Thrift Supervision" for the "Federal Home Loan Bank Board" when the Bank Board was abolished and the Office of Thrift Supervision was created. <u>See</u> Pub. L. 101-73, § 744(c). The new agency published, transferred, and recodified Bank Board regulations as its own on November 30, 1989. 54 Fed. Reg. 49411. <u>See generally</u> Malloy, <u>Nothing to Fear But FIRREA Itself: Revising and Reshaping the Enforcement Process of Federal Bank Regulation</u>, 50 Ohio State L.J. 1117 (1989).

we must inquire whether such loans are encompassed by the term "alternative mortgage transactions."

Section 3801(a)(1) indicates that the "alternative mortgage transactions" and "alternative mortgage financing" referred to are transactions employing an alternative interest rate structure that depart from the usual "fixed-term, fixed-rate" structure. Congress was referring only to regulations dealing with flexible interest rates, as is further demonstrated by the definition of "alternative mortgage transaction" in section 3802:

> As used in this chapter --
>
> > (1) the term 'alternative mortgage transaction' means a loan or credit sale secured by an interest in residential real property, a dwelling, all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a residential manufactured home . . .
> >
> > > (A) in which the interest rate or finance charge may be adjusted or renegotiated;
> > >
> > > (B) involving a fixed-rate, but which implicitly permits rate adjustments . . . or
> > >
> > > (C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation;
> >
> > described and defined by applicable regulation.

12 U.S.C. § 3802(1).

The emphasis in section 3802, as in section 3801, is on variations of interest rates and repayment schedules as contrasted to the "traditional fixed-rate, fixed-term" loan on residential property. Nothing in the section 3802 definition of "alternative mortgage transaction" suggests that Congress intended "applicable regulations" describing and defining such transactions to embrace any subject matter other than matters relevant to determining the interest rate

for transactions that could otherwise be fixed-rate transactions under existing law.

Section 3802(1)(C) defines a category of alternative mortgage transactions as "including without limitation, transactions that involve the sharing of equity or appreciation." We have received briefs arguing that this language refers to a mortgage secured by a homeowner's equity in his residence. However, the word "including" shows that the language refers only to a sub-category of transactions involving a variable interest rate, repayment period, or other variation from the traditional fixed-rate, fixed-term residential mortgage. In addition, the phrase "a sharing of equity or appreciation" would be an unusual and inaccurate description of a mortgage secured by a homeowner's equity in his home. The mortgage lender does not receive a "share" of equity (unless the money he receives in a foreclosure sale can be characterized in this way). The phrase "transactions that involve the sharing of equity or appreciation" refers instead to a joint venture in which both the lender and developer of real estate share in the profits of a project. See Annot., Agreement for Share in Earnings of or Income from Property in Lieu of, or in Addition to, Interest as Usurious, 16 A.L.R. 3d 475 (1967); see also Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp., supra, at 1364-65 (federal savings and loan association required a profit sharing interest as a condition of lending money to purchase undeveloped land). The final clause of section 3802(1)(C) deals with how loans may be structured, not with the kind of residential property interest that may secure them.

Accordingly, the Parity Act does not address the authority of state savings and loan associations to make loans secured by a homeowner's equity in his homestead; nor does it purport to preempt provisions of the Texas Constitution and statutes protecting the homestead from foreclosure for any purpose not constitutionally authorized.

## S U M M A R Y

The federal Parity Act, 12 U.S.C. §§ 3801 et. seq., does not attempt to authorize state savings and loan associations to make loans secured by a homeowner's equity in his residence, and accordingly does not purport

to authorize preemption of the Texas home-
stead laws.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Susan Garrison
Assistant Attorney General