Honorable Bruce Gibson Chairman House Government Organization Committee P.O. Box 2910 Austin, Texas 78768-2910
Re: Whether the homestead provision of the Texas Constitution has been preempted by federal legislation regulating savings and loan associations and other lending institutions (RQ-2066)
Dear Representative Gibson:
You ask whether federal law and regulations have preempted the Texas homestead provisions, in particular, article XVI, section50, of the Texas Constitution, which provides in part:
 The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon. . . . No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided. . . . All pretended sales of the homestead involving any condition of defeasance shall be void.
Tex. Const. art. XVI, § 50 (emphasis added).[1] This provision prevents the owners of homestead property from borrowing money secured by the equity in the homestead for any purpose other than the expressly authorized purposes.
Your inquiry was prompted by a 1989 opinion letter written by the deputy general counsel of the Federal Home Loan Bank Board [hereinafter Bank Board], which regulated federally chartered savings and loan associations under the Home Owners' Loan Act of 1933 [HOLA], 12 U.S.C. § 1464. The letter from the Bank Board responded to questions asked by the United States Department of Housing and Urban Development.[2]
The Bank Board's letter concluded that HOLA and regulations issued thereunder permit national savings and loan associations to issue "line of credit home equity conversion mortgages," or "reverse mortgages," which would allow the homeowner to borrow money on the security of his equity in his residence. The deputy general counsel expressed the opinion that the federal statute and regulations would preempt the Texas homestead provisions with respect to such mortgages issued by federally-chartered savings and loan associations. The Department of Housing and Urban Development also inquired whether the federal Alternative Mortgage Transaction Parity Act of 1982 [hereinafter Parity Act], 12 U.S.C. § 3801-3806, would authorize state associations to make "reverse mortgages" on an equal basis with national savings and loans associations, with the result that the Texas homestead provisions would be preempted as to mortgages issued by state-chartered associations. The Bank Board letter declined to express an opinion about state-chartered associations because they were not under its supervision.
You ask this office to review the reasoning of the deputy general counsel's opinion letter and to answer the question he left unanswered. Your inquiry raises the following issues:
 Is a federally-chartered lender permitted by federal law and regulations to make home equity loans?
 If so, does the federal authority preempt the Texas homestead exemption law, insofar as the federally-chartered lender is concerned?
 If a federally-chartered lender has authority to make home equity loans, do state-chartered lenders have similar authority to make home equity loans under the Parity Act, adopted as title VIII of the Garn-St Germain Depository Institutions Act of 1982, Pub.L. No. 97-320?
With respect to the first issue, we will not undertake to reanalyze the federal laws and regulations relied on in the Bank Board's opinion letter; instead, we will set out the letter's reasoning as a basis for reaching the next question. Any questions we have about the reasoning of the Bank Board's letter can be raised in our discussion of the preemption question.
According to the opinion letter of the Bank Board, the authority of federally-chartered savings and loan associations to make loans on the security of a home owner's equity in his residence, including "reverse mortgages," is based on the following provision of HOLA:
 An association may to such extent, and subject to such rules and regulations as the Board may prescribe from time to time, invest in, sell, or otherwise deal with the following loans, or other investments:
. . . .
(1)(b) Real property loans
 Loans on the security of liens upon residential or nonresidential real property.
12 U.S.C. § 1464(c)(1)(B) (superseded).[3] The agency's rule-making power is set out in the following provision:
 In order to provide thrift institutions for the deposit of funds and for the extension of credit for homes and other goods and services, the Director [of the Office of Thrift Management] is authorized, under such regulations as the Director may prescribe —
 (1) to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations (including Federal savings banks), and
(2) to issue charters therefore,
 giving primary consideration of the best practices of thrift institutions in the United States. The lending and investment powers conferred by this section are intended to encourage such institutions to provide credit for housing safely and soundly.
12 U.S.C. § 1464(a).
The letter from the Bank Board provides the following discussion of the regulations promulgated to implement this provision:
 The history of 12 C.F.R. pt. 545, which governs the operations of Federal associations, is crucial to this analysis. Prior to the Garn-St Germain Act, Federal associations were specifically authorized by 12 C.F.R. § 545.6-2(a)(7) and 545.6-4(d) (1981) to offer reverse mortgages to homeowners.
After the Garn-St Germain Act was enacted, the Board substantially revised 12 C.F.R. pt. 545. Explicit provisions governing reverse mortgages were removed from the regulation, and12 C.F.R. § 545.1 (1988), which reads as follows, was added:
A Federal association may exercise all authority granted it by the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464, as amended . . . whether or not implemented specifically by Bank Board regulation, subject to the limitations and interpretations contained in this part.
Thus, the letter concludes that the regulation authorizes the federally-chartered associations to exercise powers that are not specifically set out by regulations, including powers that are inconsistent with state law.
The letter quotes the preamble to 12 C.F.R. § 545.1 on the Bank Board's approach to exercise of its regulatory power:
 Current Part 545 is based upon the premise that the investment authority of the HOLA must be implemented expressly by regulation. . . . In order to grant associations the maximum flexibility to exercise the authorities granted by the HOLA, the Board has determined to revise the general approach to regulating investment activities of Federal associations. Accordingly, Part 545 now addresses the authority of associations only to limit, interpret or recognize incidental authority. Federal associations may exercise all authority granted by the HOLA subject only to limitations contained in the regulations. Because this approach differs from the current treatment, these amendments to Part 545 include a section specifically stating that Federal associations may exercise all statutory authority subject to the limitations in this Part. The Board emphasizes that deletion of sections specifically implementing existing authority does not mean that any authority can no longer be exercised.
Bank Board letter of August 4, 1989 (quoting 48 Fed. Reg. 23032
(May 23, 1983)).
The opinion letter states that federally-chartered associations may offer reverse mortgages to homeowners. It goes on to express the opinion that Texas homestead laws have been preempted with respect to federal institutions, relying on Fidelity Federal Sav. Loan Ass'n v. de la Cuesta, 458 U.S. 141 (1982) and the provisions of HOLA:
 Congress by statute has explicitly permitted Federal associations to secure loans with real estate. 12 U.S.C. § 1464(c)(1)(B). It is axiomatic that the authority to secure loans protects lenders in the event of default on such loans by foreclosing on the property constituting the security. State laws which prevent or otherwise restrict Federal associations from engaging in transactions involving such mortgages, are in conflict with Bank Board regulations.
The Texas laws in question clearly prevent Federal associations from exercising the authority granted to them by the HOLA and the Board's regulations. Therefore, this Office concludes that the constitution and statutes of Texas under review are `an obstacle to the accomplishment and execution of the purposes and objectives' of 12 C.F.R. pt. 545 to the extent that they prevent Federal associations from securing line of credit conversion mortgages with real estate consisting of homesteads, and foreclosing on such mortgages in the event of default. According to de la Cuesta, the HOLA authorizes the Board to enact regulations that preempt substantive state real property laws purporting to govern the mortgage lending operations of Federal associations. The regulatory history of 12 C.F.R. § 545 reveals that the Board exercised this authority to preempt state real property laws, insofar as reverse mortgages are concerned.
The "doctrine of preemption" is rooted in the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2; Fidelity Federal Sav. Loan Ass'n v. de la Cuesta, 458 U.S. 141,152 (1982). The Supremacy Clause requires inconsistent state laws to yield to valid federal laws and regulations. Fidelity Federal Sav. Loan Ass'n v. de la Cuesta, supra; Seiter v. Veytia,756 S.W.2d 303 (Tex. 1988).
The de la Cuesta case arose out of a conflict between a regulation of the Federal Home Loan Bank Board on "due-on-sale" clauses[4] in mortgages and California common law. The federal regulation authorized federal savings and loan associations to include a "due-on-sale" clause in the loan document, while the California Supreme Court had declared that such clauses could be exercised only under limited circumstances. The United States Supreme Court found that the California rule created an obstacle to the accomplishment and execution of the full purposes and objectives of the due-on-sale regulation. 458 U.S. at 156. It also found that the Bank Board expressly intended to preempt contrary state laws and that it acted within its authority in issuing the preemptive regulation, reviewing the language and legislative history of the HOLA to reach the latter conclusion.
We are not persuaded that the de la Cuesta case resolves the question before us. That case involved a board rule specifically authorizing the federal associations to include a "due-on-sale" clause in loan documents. It did not address the current system of regulation, which allows federal associations to exercise all statutory authority subject only to express limitations. Moreover, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 101-73, adopted amendments to HOLA directed at providing closer supervision of federal thrift institutions. 1989 U.S. Code Cong. Admin.News 432 (House Conf.Rep. No. 101-222, 101 Cong. 1st Sess.). Thus, the relevant federal provisions differ in some ways from those at issue in de la Cuesta. Expressions of congressional intent in connection with the 1989 amendments may also be relevant to the preemption question.
The 1982 case dealt with the timing of repayment of a loan secured by real property. The Texas homestead laws, however, forbid the use of equity in a homestead to securing loans for any purpose not authorized by the constitution. We are faced with a question of whether the transaction may be made at all, not merely a question of the terms of a transaction. Thus, preemption of the Texas constitutional protection for the homestead raises a different, and possibly more difficult, question than the one addressed in de la Cuesta.
Supreme Court decisions on preemption questions decided subsequent to de la Cuesta must also be considered. In California v. ARC America Corp., 109 S.Ct. 1661 (1989), the Court reiterated the presumption against finding preemption of state law in areas traditionally regulated by the states:
 When Congress legislates in a field traditionally occupied by the States, `we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'
109 S.Ct. at 1665.
In Coit Independence Joint Venture v. Federal Sav. Loan Ins. Corp., 109 S.Ct. 1361 (1989), the Bank Board claimed that HOLA and the enabling legislation of the Federal Savings and Loan Insurance Corporation (FSLIC) preempted Texas law on the adjudication of claims against federal associations and conferred this power on the FSLIC. The Supreme Court interpreted provisions governing the FSLIC and the Bank Board, adopted over a span of fifty years, to determine the Congressional intent underlying the specific provision in question. It concluded that Congress did not intend to authorize the FSLIC to adjudicate claims and that state law was not preempted.
 Finally, preemption cases can be difficult to reconcile. Levy, Karst, Mahoney, Encyclopedia of the American Constitution at 1438. Preemption questions arise because Congress has ignored the existence of related state laws and the court must deal with the factors that would have confronted the legislature had it thought about related state laws. The judges' views as to the wisdom of the federal and state laws are among the factors that may in fact be decisive in a preemption question. Id.
In answer to your second question, neither the deputy general counsel's opinion letter nor the authorities he cites convince us that the Texas homestead provisions are preempted as to federally-chartered associations by regulations issued under HOLA. Because this question ultimately cannot be resolved solely by analyzing statutes and judicial decisions, it cannot be resolved in an advisory opinion. It is a question for judicial resolution in an adversary proceeding, in which the relevant state and federal policies can be thoroughly briefed and argued. We cannot advise you that the courts would follow the approach taken by the opinion letter written by the deputy general counsel of the Bank Board.
We can, however, advise you as to the intended effect of the Parity Act, about which you inquire in your third question. Even if regulations issued under HOLA preempted the Texas homestead provisions with respect to home equity loans made by federally-chartered savings and loan associations, the Parity Act would not give state-chartered associations similar authority to make such loans. A careful reading of the Parity Act shows that it deals with interest rates and repayment terms of mortgage loans, and does not relate to the use of the equity in a homestead as security for a loan.
The Parity Act, 12 U.S.C. § 3801-3806, was enacted as title VIII of the Garn-St. Germain Depository Institutions Act of 1982. It was adopted to give state-chartered mortgage lenders parity with federally-chartered lenders with respect to "alternative mortgage loans." See 12 U.S.C. § 3801. It allows state-chartered mortgage lenders to make such transactions to the extent that they are authorized for federally-chartered institutions by valid regulation of the appropriate federal agency; that is, the Comptroller of the Currency for national banks, the National Credit Union Administration Board for federal credit unions, and the Director of the Office of Thrift Supervision (formerly the Federal Home Loan Bank Board) for federally-chartered savings and loan associations. 12 U.S.C. § 3803(a). The Parity Act thus makes applicable to state lenders certain valid regulations issued under other law by a federal regulatory agency. Id. It expressly preempts contrary provisions in state constitutions, laws, or regulations, except for states that opted out of its provisions by October 15, 1985. 12 U.S.C. § 3803(c), 3804.
The Congressional purpose in adopting the Parity Act is stated in section 3801 of title 12 of the United States Code, which provides as follows:
(a) The Congress hereby finds that —
 (1) increasingly volatile and dynamic changes in interest rates have seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed-rate credit secured by interests in real property, cooperative housing, manufactured homes, and other dwellings;
 (2) alternative mortgage transactions are essential to the provision of an adequate supply of credit secured by residential property necessary to meet the demand expected during the 1980's; and
 (3) the Comptroller of the Currency, the National Credit Union Administration, and the Director of the Office of Thrift Supervision have recognized the importance of alternative mortgage transactions and have adopted regulations authorizing federally chartered depository institutions to engage in alternative mortgage financing.
 (b) It is the purpose of this chapter to eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies. (Emphasis added.)
As subsection (b) of section 3801 indicates,[5]
federally-chartered depository institutions were already authorized by agency regulations to engage in such "alternative mortgage transactions" before the Parity Act was adopted. The purpose of the Parity Act was to enable state-chartered institutions to engage in such transactions on an equal basis with the national institutions. The Parity Act can effect a preemption of a Texas constitutional provision only if regulations issued under other federal law authorizing federally-chartered institutions to engage in alternative mortgage transactions preempt the Texas provision. See12 U.S.C. § 3803(a)(3). To determine whether state-chartered lenders have authority pursuant to the Parity Act to make loans secured by a home owner's equity, we must inquire whether such loans are encompassed by the term Falternative mortgage transactions.
Section 3801(a)(1) indicates that the "alternative mortgage transactions" and "alternative mortgage financing" referred to are transactions employing an alternative interest rate structure that depart from the usual "fixed-term, fixed-rate" structure. Congress was referring only to regulations dealing with flexible interest rates, as is further demonstrated by the definition of "alternative mortgage transaction" in section 3802:
As used in this chapter —
 (1) the term `alternative mortgage transaction' means a loan or credit sale secured by an interest in residential real property, a dwelling, all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a residential manufactured home . . .
 (A) in which the interest rate or finance charge may be adjusted or renegotiated;
 (B) involving a fixed-rate, but which implicitly permits rate adjustments . . . or
 (C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation;
described and defined by applicable regulation.
12 U.S.C. § 3802(1).
The emphasis in section 3802, as in section 3801, is on variations of interest rates and repayment schedules as contrasted to the "traditional fixed-rate, fixed-term" loan on residential property. Nothing in the section 3802 definition of "alternative mortgage transaction" suggests that Congress intended "applicable regulations" describing and defining such transactions to embrace any subject matter other than matters relevant to determining the interest rate for transactions that could otherwise be fixed-rate transactions under existing law.
Section 3802(1)(C) defines a category of alternative mortgage transactions as "including without limitation, transactions that involve the sharing of equity or appreciation." We have received briefs arguing that this language refers to a mortgage secured by a homeowner's equity in his residence. However, the word "including" shows that the language refers only to a sub-category of transactions involving a variable interest rate, repayment period, or other variation from the traditional fixed-rate, fixed-term residential mortgage. In addition, the phrase "a sharing of equity or appreciation" would be an unusual and inaccurate description of a mortgage secured by a homeowner's equity in his home. The mortgage lender does not receive a "share" of equity (unless the money he receives in a foreclosure sale can be characterized in this way). The phrase "transactions that involve the sharing of equity or appreciation" refers instead to a joint venture in which both the lender and developer of real estate share in the profits of a project. See Annot., Agreement for Share in Earnings of or Income from Property in Lieu of, or in Addition to, Interest as Usurious, 16 A.L.R.3d 475 (1967); see also Coit Independence Joint Venture v. Federal Sav. Loan Ins. Corp., supra, at 1364-65 (federal savings and loan association required a profit sharing interest as a condition of lending money to purchase undeveloped land). The final clause of section 3802(1)(C) deals with how loans may be structured, not with the kind of residential property interest that may secure them.
Accordingly, the Parity Act does not address the authority of state savings and loan associations to make loans secured by a homeowner's equity in his homestead; nor does it purport to preempt provisions of the Texas Constitution and statutes protecting the homestead from foreclosure for any purpose not constitutionally authorized.
 SUMMARY
The federal Parity Act, 12 U.S.C. § 3801 et. seq., does not attempt to authorize state savings and loan associations to make loans secured by a homeowner's equity in his residence, and accordingly does not purport to authorize preemption of the Texas homestead laws.
Very truly yours,
 Jim Mattox Attorney General of Texas
 Mary Keller First Assistant Attorney General
 Lou McCreary Executive Assistant Attorney General
 Judge Zollie Steakley Special Assistant Attorney General
 Renea Hicks Special Assistant Attorney General
 Rick Gilpin Chairman, Opinion Committee
 Prepared by Susan Garrison Assistant Attorney General
[1] The Texas homestead exemption first appeared in the statutes of the Republic of Texas and was placed in the constitution when Texas became a state in 1845. It has been included in every Texas Constitution since that time. See 2 G. Braden, The Constitution of Texas: An Annotated and Comparative Analysis at 788 (1977).
[2] Letter from Jack D. Smith, Deputy General Counsel, Federal Home Loan Bank Board to John A. Maxim, Jr., Associate General Counsel, U.S. Department of Housing and Urban Development (Aug. 4, 1989). The Federal Home Loan Bank Board was replaced with the Office of Thrift Supervision in late 1989. See infra note 5 at 10.
[3] This provision now reads as follows:
 To the extent specified in regulations of the Director [of the Office of Thrift Management], a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments:
(1) . . .
(B) Residential real property loans
Loans on the security of liens upon residential real property.
[4] A due-on-sale clause allows the lender to declare the balance on a mortgage loan immediately due and payable when the property is sold. If the lender exercises this option, the purchaser cannot assume the loan.
[5] Section 3801, indicating the intent of Congress, has not been amended since its enactment in 1982, except for the substitution in 1989 of "the Director of the Office of Thrift Supervision" for the "Federal Home Loan Bank Board" when the Bank Board was abolished and the Office of Thrift Supervision was created. See Pub.L. 101-73, § 744(c). The new agency published, transferred, and recodified Bank Board regulations as its own on November 30, 1989. 54 Fed. Reg. 49411. See generally Malloy, Nothing to Fear But FIRREA Itself: Revising and Reshaping the Enforcement Process of Federal Bank Regulation, 50 Ohio State L.J. 1117 (1989).